**PASHMAN STEIN**
A Professional Corporation
Court Plaza South
21 Main Street
Hackensack, New Jersey 07601
(201) 488-8200
Attorneys for Plaintiff,
New Jersey Turnpike Authority

A TRUE COPY ATTEST
DAVID D. AYLES, PROCESS SERVER
AND DISINTERESTED PERSON

| | |
|---|---|
| NEW JERSEY TURNPIKE AUTHORITY,<br><br>      Plaintiffs,<br><br>v.<br><br>TRANSAMERICA INSURANCE COMPANY;<br>TIG INSURANCE COMPANY; FAIRFAX<br>FINANCIAL HOLDINGS, LTD., AND<br>RIVERSTONE CLAIMS MANAGEMENT,<br>LLC,<br><br>      Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MIDDLESEX COUNTY<br><br>DOCKET NO.: L-10735-14<br><br>    Civil Action<br><br>    **SUMMONS** |

From:      The State of New Jersey

To:        The Defendant Named Above:

    The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address

appear above, or to plaintiff, if no attorney is named above.   A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529).   If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.   A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153 deptyclerklawref.pd f.


*Michelle M. Smith*
Michelle M. Smith,
Clerk of the Superior Court

DATED:  November 11, 2014

Name of Defendant to Be Served:          Riverstone Claims
                                         Management, LLC

Address of Defendant to Be Served:       250 Commercial Street
                                         Suite 5000
                                         Manchester, NH 03101

MIDDLESEX VICINAGE CIVIL DIVISION
P O BOX 2633
56 PATERSON STREET
NEW BRUNSWICK      NJ 08903-2633

                                        TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (732) 519-3728
COURT HOURS  8:30 AM - 4:30 PM

                    DATE:   NOVEMBER 05, 2014
                    RE:     NEW JERSEY TURNPIKE AUTHORITY VS TRANSAMERICA INS
                    DOCKET: MID L -010735 14

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 1.

     DISCOVERY IS   150 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE PRETRIAL JUDGE ASSIGNED IS:  HON J R. CORMAN

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      001
AT:  (732) 519-3728 EXT 3728.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:

                         ATT: DENNIS T. SMITH
                         PASHMAN STEIN
                         21 MAIN ST  STE 100
                         HACKENSACK       NJ 07601-7054

JUDMJ

**Appendix XII-B1**

| | |
|---|---|
| **CIVIL CASE INFORMATION STATEMENT**<br>**(CIS)**<br>Use for initial Law Division<br>Civil Part pleadings (not motions) under *Rule* 4:5-1<br>**Pleading will be rejected for filing, under *Rule* 1:6-6(c),**<br>**if information above the black bar is not completed**<br>**or attorney's signature is not affixed** | FOR USE BY CLERK'S OFFICE ONLY<br>PAYMENT TYPE: ☐ CK ☐ CG ☐ CA<br>CHG/CK NO.<br>AMOUNT:<br>OVERPAYMENT:<br>BATCH NUMBER: |

| ATTORNEY / PRO SE NAME<br>Dennis T. Smith, Esq. | TELEPHONE NUMBER<br>(201) 488-8200 | COUNTY OF VENUE<br>Middlesex |
|---|---|---|
| FIRM NAME (If applicable)<br>Pashman Stein, P.C. | | DOCKET NUMBER (when available)<br>*L 10735-14* |
| OFFICE ADDRESS<br>Court Plaza South<br>21 Main Street - Suite 100<br>Hackensack, New Jersey 07601 | | DOCUMENT TYPE<br>Declaratory Judgment Complaint |
| | | JURY DEMAND ☐ YES ☒ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff)<br>New Jersey Turnpike Authority | CAPTION<br>New Jersey Turnpike Authority v. Transamerica Insurance Company;<br>TIG Ins. Co.; Fairfax Financial Holdings, Ltd and Riverstone Claims<br>Management, LLC |
|---|---|
| CASE TYPE NUMBER<br>(See reverse side for listing)<br>505 | HURRICANE SANDY<br>RELATED?<br>☐ YES ☒ NO | IS THIS A PROFESSIONAL MALPRACTICE CASE? ☐ YES ☒ NO<br>IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53A -27 AND APPLICABLE CASE LAW<br>REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
| RELATED CASES PENDING?<br>☐ YES ☒ No | IF YES, LIST DOCKET NUMBERS |
| DO YOU ANTICIPATE ADDING ANY PARTIES<br>(arising out of same transaction or occurrence)?<br>☐ YES ☒ No | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (If known) ☐ NONE<br>☒ UNKNOWN |

| THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE. |
|---|
| CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION |

| DO PARTIES HAVE A CURRENT, PAST OR<br>RECURRENT RELATIONSHIP?<br>☐ YES ☒ No | IF YES, IS THAT RELATIONSHIP?<br>☐ EMPLOYER/EMPLOYEE ☐ FRIEND/NEIGHBOR ☐ OTHER (explain)<br>☐ FAMILIAL ☐ BUSINESS |
|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? ☒ YES ☐ No |
|---|
| USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR<br>ACCELERATED DISPOSITION<br><br>MIDDLESEX COUNTY<br>RECEIVED & FILED<br>NOV 0 5 2014<br>GREGORY EDWARDS<br>DEPUTY CLERK<br>OF SUPERIOR COURT |

| ♿ | DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?<br>☐ YES ☒ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|---|
| | WILL AN INTERPRETER BE NEEDED?<br>☐ YES ☒ No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be
redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE: *[signature]*

Effective 08-19-2013, CN 10517-English                                                                page 1 of 2



**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule 4:5-1*

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
151 NAME CHANGE
175 FORFEITURE
302 TENANCY
399 REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
502 BOOK ACCOUNT (debt collection matters only)
505 OTHER INSURANCE CLAIM (including declaratory judgment actions)
506 PIP COVERAGE
510 UM or UIM CLAIM (coverage issues only)
511 ACTION ON NEGOTIABLE INSTRUMENT
512 LEMON LAW
801 SUMMARY ACTION
802 OPEN PUBLIC RECORDS ACT (summary action)
999 OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
305 CONSTRUCTION
509 EMPLOYMENT (other than CEPA or LAD)
599 CONTRACT/COMMERCIAL TRANSACTION
603N AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
603Y AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
605 PERSONAL INJURY
610 AUTO NEGLIGENCE – PROPERTY DAMAGE
621 UM or UIM CLAIM (includes bodily injury)
699 TORT – OTHER

**Track III - 450 days' discovery**
005 CIVIL RIGHTS
301 CONDEMNATION
602 ASSAULT AND BATTERY
604 MEDICAL MALPRACTICE
606 PRODUCT LIABILITY
607 PROFESSIONAL MALPRACTICE
608 TOXIC TORT
609 DEFAMATION
616 WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
617 INVERSE CONDEMNATION
618 LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
156 ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
303 MT. LAUREL
508 COMPLEX COMMERCIAL
513 COMPLEX CONSTRUCTION
514 INSURANCE FRAUD
620 FALSE CLAIMS ACT
701 ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**
266 HORMONE REPLACEMENT THERAPY (HRT)
271 ACCUTANE/ISOTRETINOIN
274 RISPERDAL/SEROQUEL/ZYPREXA
278 ZOMETA/AREDIA
279 GADOLINIUM
281 BRISTOL-MYERS SQUIBB ENVIRONMENTAL
282 FOSAMAX
284 NUVARING
285 STRYKER TRIDENT HIP IMPLANTS
286 LEVAQUIN
287 YAZ/YASMIN/OCELLA
288 PRUDENTIAL TORT LITIGATION
289 REGLAN
290 POMPTON LAKES ENVIRONMENTAL LITIGATION
291 PELVIC MESH/GYNECARE
292 PELVIC MESH/BARD
293 DEPUY ASR HIP IMPLANT LITIGATION
295 ALLDDERM REGENERATIVE TISSUE MATRIX
296 STRYKER REJUVENATE/ABG II MODULAR  HIP STEM CDMPONENTS
297 MIRENA CONTRACEPTIVE DEVICE
601 ASBESTOS
623 PROPECIA

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

**Please check off each applicable category** ☐ **Putative Class Action** ☐ **Title 59**

Dennis T. Smith, Esq./026931988
PASHMAN STEIN, P.C.
Court Plaza South
21 Main Street, Suite 100
Hackensack, NJ 07601
(201) 488-8200

Attorneys for Plaintiff,
New Jersey Turnpike Authority

SUPERIOR COURT
MIDDLESEX COUNTY
RECEIVED & FILED

NOV 0 5 2014

GREGORY EDWARDS
DEPUTY CLERK
OF SUPERIOR COURT

| | |
|---|---|
| NEW JERSEY TURNPIKE AUTHORITY, <br><br> Plaintiffs, <br><br> v. <br><br> TRANSAMERICA INSURANCE COMPANY; TIG INSURANCE COMPANY; FAIRFAX FINANCIAL HOLDINGS, LTD., AND RIVERSTONE CLAIMS MANAGEMENT, LLC, <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION – MIDDLESEX COUNTY <br> DOCKET NO.: $\mathcal{L}$ 10735-14 <br><br> Civil Action <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT** |

Plaintiff, New Jersey Turnpike Authority ("NJTA"), by way of complaint against Transamerica Insurance Company, TIG Insurance Company, Fairfax Financial Holdings, Limited and Riverstone Claims Management LLC (collectively referred to as "Defendants") states as follows:

### A. NATURE OF ACTION

1.    In this action, NJTA seeks a declaration that TIG Insurance Company (TIG) its excess workers compensation insurer is obligated to reimburse it for costs incurred in connection with a workers' compensation claim filed by its former employee

Michael Faas.  The NJTA also contends that TIG is estopped from disputing its payment obligation and its continued refusal to do so constitutes bad faith.

### B. THE PARTIES

2.    The NJTA is a body corporate and politic of the State of New Jersey which owns and operates the New Jersey Turnpike and Garden State Parkway.  Its administrative offices are located at 581 Main Street, Woodbridge, New Jersey 07095.

3.    By virtue of N.J.S.A 27:23-5, the NJTA is authorized to sue and be sued in its own name.

4.    Defendant Transamerica Insurance Company ("Transamerica") was an insurance company licensed to do business in New Jersey and issued the subject insurance policy to the NJTA.

5.    In 1993 Transamerica Corporation, the owner of defendant Transamerica, divested itself of the company and Transamerica became defendant TIG. TIG is licensed to do business in New Jersey and maintains a principal place of business at 250 Commerce Street, Suite 5000, Manchester, New Hampshire 03101.

6.    In 2000 Defendant Fairfax Financial Holdings Limited ("Fairfax") acquired TIG.  Fairfax's principal place of business is located at 95 Wellington Street, West Toronto, Ontario,

2

M5J2NZ.   Upon information and belief Fairfax has a U.S. office located at 2850 Lake Vista Drive, Suite 150, Lewisville, Texas 75056.

7.    Sometime after 2002, Fairfax placed TIG into runoff, meaning that TIG and/or its representatives would not underwrite any new business and would only handle and resolve claims on expired policies.

8.    Defendant Riverstone Claims Management, LLC ("Riverstone") is owned by Fairfax and since 2011 has been overseeing the runoff of TIG including the claim that is the subject of this lawsuit. Riverstone maintains a principal place of business at 250 Commerce Street, Suite 5000, Manchester, New Hampshire 03101.

## C. THE POLICY

9.    Transamerica issued the NJTA an excess workers' compensation policy bearing policy number W-141626A with a policy period of January 21, 1990 to January 21, 1991.   The policy is attached as Exhibit "1".   The policy was renewed for the policy periods January 21, 1991 to January 21 1992 and January 21, 1992 to January 21, 1993.

10.   The policy contains a per occurrence limit of $10,000,000 excess of a $250,000 self-insured retention (the "SIR").

3

11.   **PART 1. COVERAGE** provides in part:

> **Self-Insured Indemnity Coverage.** The Company
> will indemnify the Insured for loss
> resulting from an occurrence during the
> contract period provided. . . such loss
> would be compensable under the Workers'
> Compensation Act of any state for employees
> injured who are normally employed in the
> state named in Item 3 of the Declarations
> [New Jersey] . . .

12.   **PART 2. RETENTION AND LIMIT OF INDEMNITY** provides in

part:

> No indemnity shall be afforded under this
> Policy, unless and until the Insured shall
> first have sustained loss as a result of
> each occurrence in excess of the amount of
> the Retention stated in Item 5 [$250,000]
> for the types of coverage involved of the
> Declarations.  The Company hereby agrees to
> indemnify the Insured against loss as a
> result of each occurrence in excess of such
> Retention, subject to the Limit of Indemnity
> provided for in Item 4 of the types of
> coverage involved of the Declarations.

> The Company shall indemnify the Insured for
> claim expenses for loss in excess of the
> Retention in the same proportion as the
> amount of loss paid by the Company in excess
> of the Retention bears to the total amount
> of such loss.

13.   According to the policy, "loss" means only such

amounts as are actually paid by the insured in payment of

benefits under the applicable Workers' Compensation Act in

settlement of claims or in satisfaction of awards or judgments.

4

14.   **Part 7. ADMINISTRATION AND REPORTING OF CLAIMS**

provides in part:

> The Insured shall be responsible for the investigation, settlement, defense or appeal of any claim made or suit brought or proceeding instituted against the Insured and shall give immediate notice to Wexford Underwriting Managers, Inc. upon learning of any of the following:. . .   any claim, suit or proceeding that appears to involve indemnity by the Company. . .

> **\* \* \* \* \* \* \* \***

> The Insured shall forward promptly to Wexford Underwriting Managers, Inc. any information it may request on the individual occurrences, claims or cases.

> **\* \* \* \* \* \* \* \***

> The Company, at its own election and expense and in addition to any indemnity for claim expenses provided by this Policy, shall have the right but not the duty to participate with the Insured in, or to assume in the name of the Insured control over, the investigation, settlement, defense or appeal of any claim, suit or proceeding which might involve liability of the Company.

15.   **PART 8. LOSS PAYABLE** provides:

> The Company will indemnify the Insured for any loss for which it may be liable under this policy as follows:

> (a)   As respects **PART 1** - Coverage, Self Insurers Indemnity Coverage, payment shall first be made by the Insured for all benefits required of the Insured under Workers' Compensation Law and the Company shall reimburse the Insured at monthly intervals after the Company has received proofs of payment by the

5

> Insured.  Workers' Compensation awards
> that may involve the Company may not be
> settled on a lump sum basis without
> prior written consent of the Company.

D.   THE UNDERLYING CASE: *FAAS V. NEW JERSEY TURNPIKE*
     *AUTHORITY*

16.   Michael Faas was a toll collector at the NJTA for

approximately eight (8) years prior to a September 25, 1992

incident in which he was exposed to chemicals from a tanker

truck that passed through an adjoining toll lane.  As a result

of the incident, Mr. Faas experienced pulmonary problems and a

workers' compensation action was filed on his behalf against the

NJTA.  The NJTA brought a third-party complaint against the

Second Injury Fund arguing that Mr. Faas had pre-existing

pulmonary problems, due in part, to his past history of smoking

and thus his claimed disability was not 100% percent related to

the September 25th chemical exposure.

17.   On June 12, 1998, the Judge of Compensation rendered a

decision in which he rejected NJTA's argument that Mr. Faas'

pre-existing conditions contributed to his disability concluding

that Mr. Faas suffered a total disability and that disability

had been solely caused by his exposure to chemicals while in the

employ of the NJTA.  Decision is attached as Exhibit "2".

Specifically, the Judge of Compensation stated:

> I have never seen a pulmonary case quite as
> impressive as the disability that this
> gentlemen certainly has.  He has had a

6

> significant amount of problems over the last
> number of years.  He is emotionally crippled
> because of these disabilities.  His life has
> been stopped short at a young age and
> frankly beyond any of his control. It is
> unfortunate that this gentleman has been
> left with this disability that I found.

18.   The NJTA appealed this decision.  On January 19, 2000 the Appellate Division affirmed the Compensation Judge's determination that Mr. Faas was 100% permanently and totally disabled solely as a result of the September 25, 1992 incident and whatever pre-existing disability Mr. Faas may have had neither impaired his ability to work or affected his personal lifestyle.  Appellate Division decision is attached as Exhibit "3".

### E.  HANDLING OF THE FAAS CLAIM

19.   The NJTA employs a Third-Party Administrator ("TPA") who oversees the workers' compensation claims filed against NJTA.  The TPA, among other things, oversees payment of legal fees and indemnity payments within the NJTA's SIR and provides reports to the excess carrier when claims are likely to exceed the SIR.

20.   On March 3, 2000 NJTA's TPA provided Transamerica's designated representative Wexford Underwriting Managers, Inc. ("Wexford") with its initial status report of the *Faas* matter. The correspondence provided a description of both the trial and Appellate Courts' decisions, calculated the amount of benefits

7

to be paid and initially observed that this claim "should not

pierce the SIR until sometime after December 13, 2011." March

3, 2000 status report is attached as Exhibit "4".

21. On March 13, 2000 Wexford responded stating that

"[b]ased on the information you have provided, we have decided

to monitor the claim as an incident file. . ." Wexford

responding letter is attached as Exhibit "5".

22. On July 29, 2002, NJTA's TPA provided Wexford with a

status report. July 29, 2002 status report is attached as

Exhibit "6". Under a section of the report entitled Medical it

states:

> As you are aware, along with this award, the
> Turnpike Authority is also responsible for
> future medical treatment required by the
> Petitioner, for pulmonary related illnesses.
> Unfortunately, since receiving this award,
> the Petitioner has required substantial
> medical treatment, which includes several
> hospital stays for chronic obstructive
> pulmonary disease. With an injury such as
> this, it is very difficult to separate what
> is related to his pulmonary disease from his
> cardiac, kidney and diabetes, as they are
> all inter-related. That is why we
> immediately assigned one of our medical case
> managers to this claim after learning of
> Petitioner's recent medical problems.
>
> The Petitioner is stable at the moment and
> is not receiving treatment for any
> pulmonary-related conditions at this time.
> However, it is possible that a relapse could
> occur at any time. We will continue to
> monitor this and if there is a relapse, our
> case manager will reopen the claim in order
> to manage the medical treatment.

8

23.   In this July 29, 2002 correspondence, Wexford was advised that the NJTA's self-insured retention of $250,000 had been exhausted and NJTA sought $90,731.14 in reimbursement from the excess carrier.

24.   On July 31, 2002, Wexford responded:

> Thank you for your recent update regarding the above-captioned claim. Based on our further review, we have established an open excess claim file and referred this to TIG for their opinion and recommendations.   On an ongoing basis, we may need copies of all medical, rehabilitation and investigative reports as well as any other pertinent information to enable us to properly evaluate this claim.   I will let you know what is specifically required by TIG. [Wexford response is attached as Exhibit "7"].

25.   On October 8, 2002, TIG reimbursed the NJTA the $90,731.14 requested in the July 29, 2002 correspondence and also provided a check of $8,889.44 representing pro-rata defense costs. TIG correspondence is attached as Exhibit "8".

26.   On November 22, 2002, another status report was provided to Wexford.   November 22, 2002 status report is attached as Exhibit "9".   Under the medical section of the report, it stated:

> The Petitioner is basically stable at the moment as far as his pulmonary injury is concerned.   However, the Petitioner did recently contact our office and report that he has been having a problem with his throat.   As a result, his doctor wanted to

9

refer him to a throat doctor for an
evaluation.  I spoke with our nurse/case
manager about this and she indicated that
the Petitioner needs to be very careful with
anything remotely respiratory.  If he were
to get a throat infection, it could lead to
a pulmonary problem, so she felt he should
definitely been seen by a throat doctor.  As
a result, we have authorized the
examination.

We have continued to receive medical bills
from providers for various injuries/
illnesses, some of which we do not feel are
related to his pulmonary condition.  As a
result, we continue to review and deny when
necessary.  As you are aware with a
subjective injury such as this, the medical
providers attempt to claim that almost
everything is related to his pulmonary
problems.

27.  On May 30, 2003, Wexford was advised that the NJTA

would hire a pulmonary physician to perform an examination of

Mr. Faas and "get a medical status on his current condition, and

also to obtain an outlook with regard to ongoing medical

treatment."  May 30, 2003 correspondence is attached as Exhibit

"10".  Notably, the correspondence mentions that a prior IME was

cancelled because the doctor was more of a permanency doctor

which is not necessary here "as the compensation courts have

already found Mr. Faas totally and permanently disabled."

28.  On January 7, 2004, the NJTA's TPA provided Wexford

with the Independent Medical Examination ("IME") report of Dr.

Henry Velez, a pulmonologist to be used in connection with

10

future medical payments.  January 7, 2004 correspondence and Dr. Velez report are attached as Exhibit "11".

29.   On January 23, 2004, the NJTA's TPA provided a status letter to Wexford.  The correspondence reflected that $32,379.14 in reimbursement was owed and asked permission to send Dr. Velez's report to Mr. Faas "so that he is aware of which treatment we will be authorizing going forward, as part of his workers' compensation claim."  January 23, 2004 status report is attached as Exhibit "12".

30.   In response, Wexford asked for a copy of the payment history on the claim, which was provided to it.  Payment history request and response are attached as Exhibit "13".

31.   On April 16, 2004, the NJTA's TPA sent a status update to Wexford.  This letter provided that Dr. Velez's report has been provided to Mr. Faas and there was an outstanding balance of $39,581.53 owed to the NJTA.  April 16, 2004 status report is attached as Exhibit "14".

32.   On June 3, 2004, TIG sent a check for $39,581.53 to pay the reimbursement owed and $2,583.10 for reimbursement of pro-rata claim expenses.  June 3, 2004 correspondence and copies of checks are attached as Exhibit "15".

33.   On September 1, 2004, the NJTA's TPA provided Wexford with a status report and requested $10,191.16 in reimbursement which TIG paid on September 30, 2004.  September 1, 2004 status

11

report and September 30, 2004 payment correspondence are attached as Exhibits "16" and "17".

34.  On February 14, 2005, the NJTA's TPA provided Wexford with a status report and requested $15,338.56 in reimbursement. February 14, 2005 status report is attached as Exhibit "18". TIG paid this amount on or about March 1, 2005.

35.  On April 17, 2007, the NJTA's TPA sent a status letter to Wexford and requested $211,864.27 in reimbursements.  April 17, 2004 status report is attached as Exhibit "19".  On April 24, 2007 Wexford wrote to TIG requesting that they issue payment in this amount.  Wexford's April 24 letter is attached as Exhibit "20".

36.  On May 16, 2007, TIG sent a $39,249.53 check to the NJTA without any explanation.  May 16, 2007 correspondence and copy of the check are attached as Exhibit "21".

37.  On September 13, 2007, the NJTA's TPA sent Wexford a status letter and requested $235,442.16 in reimbursement.  On September 24, 2007, TIG sent a $57,291.91 check to the NJTA without any explanation.  September 13 status report and September 24 payment correspondence are attached as Exhibits "22" and "23".

38.  On January 26, 2009, the NJTA TPA sent Wexford a status letter which provides: "Mr. Faas has had several admissions to the hospital on numerous occasions.  Most of the

12

admissions are being reviewed by nurse case manager Nancy
Kulscar, RN. . . to see if the admission had anything to do with
our claim.  The claimant's most recent admission to St. Peter's
Hospital. . . was on 11/18/08 - 12/23/08 and his admitting
diagnosis was respiratory failure."  January 26, 2009 status
report is attached as Exhibit "24".The letter further provides
that: "[d]uring his stay in the hospital he was placed on a
ventilator and now needs to be treated for diabetes as they are
relating this to the prednisone he is taking for our pulmonary
claim.  He is not functioning independently and requires a
visiting nurse.  The number of hours has not yet been
determined."  This letter also requested $259,641.72 in
reimbursement.

39.  On April 29, 2010, the NJTA's TPA sent Wexford a
status letter advising that because of Mr. Faas' severe
pulmonary condition, he needs 24 hour nursing services.  The
letter also requested $438,600.67 in reimbursement.  April 29,
2010 status report is attached as Exhibit "25".

40.  After several requests for reimbursement from the NJTA
went unanswered, a third-party contractor retained by TIG to
handle the claim wrote to TIG requesting a check in the amount
of $393,996.25 and stated: "[y]ou are very familiar [with] this
high-exposure claim that involves live-in-care.  The file has
not been reimbursed since September 2007."  July 21, 2010 email

is attached as Exhibit "26". No payment was made and no explanation for refusing to pay was provided.

41. On July 27, 2011, the NJTA's TPA sent a status letter to Wexford in which it sought reimbursement in the amount of $1,380,900.02 principally incurred as a result of Mr. Faas' recent hospitalizations and required twenty-four (24) hour nursing care. July 27, 2011 status report is attached as Exhibit "27". No payment was made and no explanation for refusing to pay was provided.

42. On January 4, 2012, the NJTA's TPA wrote to Mr. Mason at the Riverstone Group who recently became involved in the handling of the Faas claim on behalf of TIG stating: "Can you please advise what is it that I need to do in order to seek some of the recovery back for the Turnpike. I have been providing information and phone conferences since 2010." January 4, 2012 email is attached as Exhibit "28".

43. A few weeks later on January 31, 2012, the NJTA's TPA wrote to Mr. Mason stating:

> Attached are a string of emails from Linda, Louis, NCM. She continues to update us on Mr. Faas medical status. He is still in the hospital and not doing well. . . We are looking at a significant hospital bill which will need to be audited. We continue to wait for reimbursement. If you are waiting on anything from me which may be holding up reimbursement, please let me know. [January 21, 2012 email is attached as Exhibit "29".]

14

44.   Mr. Faas, who had been in the hospital since December 30, 2011, passed away on February 20, 2012.

45.   On May 23, 2012, the NJTA's TPA wrote Mr. Mason seeking reimbursement for this claim.   At the time, $1,747,011.61 was requested for reimbursement. Having not received a response, the TPA again wrote to Mr. Mason on July 30, 2012 and again on September 4, 2012.   In the September 4, 2012 email to Mr. Mason, the TPA stated:

> Our client patiently waits for a response to reimbursement on this claim.   If you are no longer handling the claim, please put me in contact with someone who will assist me. [September 4, 2012 email is attached as Exhibit "30"].

46.   At no time between 2000 and Mr. Faas' death in 2012 did TIG exercise its right to take over the investigation of the claim.

47.   At no time between 2000 and Mr. Faas' death in 2012 did TIG issue a coverage position letter detailing why it is not required to make the requested payments pursuant to the terms and conditions of its policy.

48.   Incredibly, after Mr. Faas' death, TIG provided the NJTA with a report that concluded "[i]t is highly unlikely that [Mr. Faas] experienced little more than one week or two of an irritation of his pre-existing COPD."   In effect, TIG is rearguing the causation argument that was rejected by both the

15

trial and Appellate Courts to support its refusal to make any further medical reimbursement payments.

49. From late 2007 to June 2014, TIG failed to may any reimbursement payments. A June 2014 payment in the amount of $91,857.67 came in response to a January 7, 2014 Demand Letter requesting $2,291,136.24 in reimbursement. According to TIG, this amount represented reimbursement of the outstanding indemnity payments due pursuant to the court rulings.

50. There is no legitimate basis for TIG's continued failure to provide reimbursement to the NJTA under the policy, or for its agent's attempts to dispute liability on issues which were fully litigated over a decade ago.

### F. RELIEF SOUGHT

51. The NJTA seeks a declaration under N.J.S.A. 2A:16-50 et seq. that pursuant to the terms of the policy, TIG f/k/a Transamerica is required to reimburse it for all amounts due and owing on Mr. Faas' claim in excess of the self-insured retention.

### COUNT ONE
### (DECLARATORY RELIEF AND BREACH OF CONTRACT)

52. The NJTA repeats and realleges the allegations contained in paragraphs 1-51 as fully set forth in at length herein.

16

53.   The Transamerica policy provides that Transamerica will indemnify the NJTA against loss as a result of each occurrence in excess of the self-insured retention.

54.   TIG f/k/a Transamerica breached its insurance contract with the NJTA by refusing to fully indemnify the NJTA for the amounts it paid in connection with Mr. Faas' workers' compensation claim.

55.   An actual and justifiable controversy exists between the NJTA and TIG regarding the construction and interpretation of the specific excess insurance policy in relation to the NJTA's claim for reimbursement of monies paid on Mr. Faas' workers' compensation claim; and any other monies due the NJTA pursuant to the policy.

56.   The NJTA is entitled to a declaration that TIG, in accordance with the terms and provisions of its specific excess workers' compensation policy, is required to reimburse the NJTA for the full amount it paid on Mr. Faas' claim in excess of the self-insured retention, including but not limited to its pro-rata share of claim expenses.

**WHEREFORE** the NJTA demands judgment in its favor and against Defendants for the following relief.

    (a)   A declaration that Defendants are required to reimburse the NJTA for monies spent in connection with Mr. Faas' workers' compensation claim in excess of the

17

self-insured retention and any other monies due the NJTA pursuant to the policy;

(b) Compensatory damages for breach of contract with the NJTA;

(c) Attorneys' fees together with interest and costs of suit in accordance with the New Jersey Rules of Court; and

(d) Such other and further relief as the Court deems just and proper.

**COUNT TWO**
**(BAD FAITH)**

57. The NJTA repeats and realleges the allegations contained in paragraphs 1-56 as if fully set forth in at length herein

58. Following the NJTA's exhaustion of its $250,000 self-insured retention in July of 2002, TIG provided reimbursement to the NJTA for expenses covered under the policy until late 2007 when it, without explanation, unilaterally stopped making payments.

59. TIG never provided the NJTA with a Coverage Position Letter as to why, pursuant to the terms of the policy, it stopped reimbursing the NJTA.

60. Recently, TIG, while refusing to refused to reimburse the NJTA, has raised issues of medical causation that were

18

previously argued by the NJTA before the Judge of Compensation and the Appellate Division, which arguments were soundly rejected by both of those courts.

61.  TIG's failure to provide the NJTA with a Coverage Position Letter detailing a policy based explanation as to why it was denying coverage at any time from 2000 to Mr. Faas' death violated its fiduciary duty to the NJTA and its duty of good faith and fair dealing; these violations constitute bad faith.

62.  There was and is no reasonable or fairly debatable basis for TIG to justify its conclusion that it is not required to reimburse the NJTA on the basis of medical causation issues that have been previously ruled upon by the New Jersey Courts.

63.  As a result of TIG's breach of its duty of good faith and fair dealing under its contract of insurance with the NJTA, the NJTA has suffered damages.

**WHEREFORE** the NJTA demands judgment in its favor and against defendants for the following relief:

(a)  Compensatory damages;

(b)  Punitive damages;

(c)  Attorneys' fees together with interest and cost of suit in accordance with the New Jersey Rules of Court; and

(d)  Such other and further relief as the court deems just and proper.

19

## COUNT THREE
### (ESTOPPEL)

64.   The NJTA repeats and realleges the allegations contained in paragraphs 1 - 63 as if fully set forth at length herein.

65.   TIG reimbursed the NJTA for payments made from 2002 to 2007 without questions.

66.   At no time did TIG provide the NJTA with a policy based explanation of why it refused to reimburse the NJTA.

67.   At no time did TIG exercise its right to take control of the action provided for in the insurance policy.

68.   The NJTA paid out on the Faas claim in reliance upon TIG's actions that reimbursement would be made.

69.   TIG knew or should have known that its conduct in the handling of the Faas claim led the NJTA to believe that reimbursement would be made.

70.   TIG should be estopped from denying responsibility for reimbursing the NJTA for the amounts it paid.

**WHEREFORE** the NJTA demands judgment in its favor  and against defendants for the following relief:

(a)   Estopping defendants from raising any defense as to their obligation to reimburse the NJTA;

(b)   Compensatory damages;

(c)   Punitive damages;

20

(d)   Estopping defendants from raising any defense as to

their obligation to reimburse the NJTA;

(e)   Attorneys' fees together with interest and costs of

suit in accordance with the New Jersey Rules of Court;

and

(f)   Such other relief as the court deems just and proper.

> **PASHMAN STEIN**
> A Professional Corporation
> Attorneys for Plaintiff
>   **New Jersey Turnpike**
>   **Authority**

Dated: November 4, 2014          By: _____
                                         DENNIS T. SMITH

## DESIGNATION OF TRIAL COUNSEL

DENNIS T. SMITH, ESQ. is hereby designated as trial counsel

pursuant to R. 4:25-4 et. seq.

> **PASHMAN STEIN**
> A Professional Corporation
> Attorneys for Plaintiff
>   **New Jersey Turnpike**
>   **Authority**

Dated: November 4, 2014          By: _____
                                         DENNIS T. SMITH

21

## CERTIFICATION

Upon information and belief, I hereby certify pursuant to R. 4:5-1 that the matter in controversy is not the subject of any other action in any court or of a pending arbitration proceeding. I further certify that, to my knowledge, no other party should be joined in the within action.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**PASHMAN STEIN**
A Professional Corporation
Attorneys for Plaintiff
**New Jersey Turnpike Authority**

Dated:   November 4, 2014          By: _____

DENNIS T. SMITH

22

EXHIBIT 1

# SPECIFIC EXCESS WORKERS' COMPENSATION POLICY

## TRANSAMERICA INSURANCE COMPANY
(A Stock Company, herein called the "Company")
6300 Canoga Avenue, Woodland Hills, California 91367

### WEXFORD UNDERWRITING MANAGERS, INC.
260 California Street, Suite 900, San Francisco, CA 94111

POLICY NUMBER: W - 141626A

# DECLARATIONS

ITEM 1 - Name and Address of Insured:

New Jersey Turnpike Authority
Administration Building
P.O. Box 1121
New Brunswick, New Jersey 08903

ITEM 2 - Effective Date: January 21, 1990        Expiration Date: January 21, 1991
12:01 A.M., standard time at the address of the Insured as stated herein.
Cancellation Notice: 30 Days

ITEM 3 - Coverage under this Policy applies to the Workers' Compensation Act of each of the following states:
New Jersey

ITEM 4 - Company's Limit of Indemnity Each Occurrence
  (a) For Workers' Compensation:             $10,000,000
  (b) For Employer's Liability: See Endorsement #4    $   500,000
  (c) For Workers' Compensation & Employer's Liability Combined:    $10,000,000

ITEM 5 - Insured's Retention Each Occurrence:    $250,000

ITEM 6 - Business Operations of Insured

| CLASSIFICATION OF OPERATIONS | CODE NO. | ESTIMATED ANNUAL REMUNERATION | RATE PER $100 REMUNERATION | ESTIMATED STANDARD PREMIUM |
|---|---|---|---|---|
| All Operations | — | $80,677,516 | | — |
| | | Total Estimated Manual Premium: | | $2,734,967 |

ITEM 7 - Policy Premium: $201,700      Advance Premium for this Policy:    $201,700
       adjustable at .25 per $100 of Payroll

ITEM 8 - Minimum Premium for this Policy: $201,700

ITEM 9 - Endorsements forming part of Policy at time of issue: WTA-17

The declarations shall not be binding on the Company unless countersigned by a duly authorized representative of the Company.
Dated at    San Francisco Calif    this   5th   day of   February    1990.

By _____
(Authorized Representative)

Producer's Name:   Rasmussen Agency, Inc.      Producer's Code:   WP - 0066

TAW - 01 (1-89)

Endorsement No. _____2_____

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein. (The following information is required only when this endorsement is issued subsequent to preparation of the Policy).

INSURED ____NEW JERSEY TURNPIKE AUTHORITY____

Policy No. ____W - 141625A____

Endorsement Effective ____JANUARY 21, 1991____
(12:01 A.M.)

Countersigned _____
(Authorized Representative)

by TRANSAMERICA INSURANCE COMPANY, Woodland Hills, California

## RENEWAL ENDORSEMENT

This Policy is changed to provide:

For the period January 21, 1991 to January 21, 1992, the following Declaration items are amended as shown below:

ITEM 4 – Company's Limit of Indemnity Each Occurrence
    (a) For Workers Compensation:     $ 10,000,000
    (b) For Employers Liability: See Endorsement #1    $   500,000
    (c) For Workers Compensation & Employers Liability Combined:   $ 10,000,000

ITEM 5 – Insured's Retention Each Occurrence: $250,000

ITEM 6 – Business Operations of Insured   (a)    Estimated Annual Remuneration:    $   87,676,000
    (b)    Total Estimated Manual Premium:    $3,954,228

ITEM 7 – Policy Premium: $219,200     Advance Premium for this Policy:    $219,200
    adjustable at .25 per $100 of Payroll

ITEM 8 – Minimum Premium for this Policy: $219,200

ITEM 9 – Additional Endorsements forming part of Policy at time of Renewal: WTA-325

This Endorsement will not vary, alter or extend any agreement, provision, condition or declaration of the Policy other than as stated above.

WTA-325 (11/89)

Endorsement No. _____7_____

This Endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.
(The following information is required only when this Endorsement is issued subsequent to preparation of the Policy).

INSURED _____NEW JERSEY TURNPIKE AUTHORITY_____

Policy No. _____W-141626A_____              Endorsement Effective _____JANUARY 21, 1991_____
                                                                              (12:01 A.M.)

                                            Countersigned _____
                                                                     (Authorized Representative)

by TRANSAMERICA INSURANCE COMPANY, Woodland Hills, California

### AUDIT ADDITIONAL PREMIUM ENDORSEMENT

This Policy is changed to provide:

In consideration of an additional premium of $3,780 it is understood and agreed that the following is the final premium adjustment for the period _January 21, 1990_ to _January 21, 1991_:

| | |
|---|---|
| Actual Exposure | $ 82,192,086 |
| Rate | .2500 |
| Earned Premium | $ 205,480 |
| Less Advance Premium | $ 201,700 |
| Additional Premium | $ 3,780 |

This Endorsement will not vary, alter or extend any agreement, provision, condition or declaration of the Policy other than as stated above.

WTA-05 (7/90)

Endorsement No. _____ 1

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.  (The following information is required only when this endorsement is issued subsequent to preparation of the Policy).

INSURED _____ NEW JERSEY TURNPIKE AUTHORITY

Policy No. _____ W-141626A          Endorsement Effective     JANUARY 21, 1990

                                                          (12:01 A.M.)

                              Countersigned _____

                                                          (Authorized Representative)

by TRANSAMERICA INSURANCE COMPANY, Woodland Hills, California
_____

## EMPLOYERS LIABILITY LIMITATIONS ENDORSEMENT

This Policy is changed to provide:

Notwithstanding anything in the Policy to the contrary, when this Endorsement is used, the Company's liability under that portion of Part I, Coverage, of the Policy which is entitled, "Employers Liability Indemnity Coverage," shall be subject to the following aggregate and per occurrence limitations.  The Company's maximum limit of liability thereunder for loss arising out of any one occurrence shall not exceed:

  **$500,000** Each Occurrence

    In excess of the Insured's retention set forth in Item 5 of the Declarations applicable to each occurrence, and shall not exceed

  **$500,000** Policy Limit

    Policy limit is the maximum limit of the Company's indemnity for all occurrences taking place during the normal contract period.

This Endorsement will not vary, alter or extend any agreement, provision, condition or declaration of the Policy other than as stated above.

WTA-17 (1/80)

## INSURANCE BINDER



## RASMUSSEN AGENCY, Inc.
### 60 EVERGREEN PLACE
### EAST ORANGE, N.J. 07018

**TELEPHONE:**
(201) 675-3940

**FAX:**
(201) 675-5674

**BINDER SIGNED:** December 21, 1990

New Jersey Turnpike Authority
PO Box 1121
New Brunswick, NJ 08903

Attn: Miss Laurine Purola
Director of Risk Management

**EFFECTIVE DATE:** January 21, 1991

**COMPANY:** Transamerica Insurance Company

THANK YOU FOR YOUR INSTRUCTIONS, AND ACCORDINGLY WE HAVE EFFECTED INSURANCE AS INDICATED BELOW. PLEASE REVIEW THIS CONFIRMATION, AND ADVISE US IF ANY CHANGES ARE REQUIRED. THIS IS YOUR ACKNOWLEDGEMENT PENDING RECEIPT OF FORMAL POLICY OR ENDORSEMENT.

**INSURED:** As above

**P.O. ADDRESS:** As above

**LOCATION:** As above and elsewhere in the State

**COVERAGE & LIMITS:** Specific Excess Workers Compensation

$10,000,000. Limit Excess of $250,000. SIR Per Occurrence
$    500,000. Limit Employers Liability Excess of $250,000. SIR
            Occurrence & Aggregate

**TERM:** 1 Year

**RATE:** .25 Per $100. of Payroll (Estimated at $87,676,900.

**PREMIUM:** $219,200. (Deposit)

**LOSS PAYEE:** None

**COPIES TO:** Transamerica Ins. Co.

**RASMUSSEN AGENCY, INC.**

by: ROBERT F. HUGHES
    Executive Vice President
DATE: December 21, 1990



SM

# TRANSAMERICA INSURANCE GROUP

**Insured:** <u>NEW JERSEY TURNPIKE AUTHORITY</u>

## Excess Workers' Compensation and Employer's Liability Policy

Administered By:



*Rasmussen agency, inc.*

*Insurance*

Telephone: (201) 675-3940
60 Evergreen Place, East Orange, N.J. 07018



WEXFORD UNDERWRITING MANAGERS, INC.
SAN FRANCISCO                    NEW YORK

11/01/92   10:40   FAX 1 905{   2 2110         RASMUSSEN                               ⌀003

Endorsement No. _____4_____

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein. (The following information is required only when this endorsement is issued subsequent to preparation of the Policy).

INSURED ____NEW JERSEY TURNPIKE AUTHORITY____

Policy No. ___W - 149626A___          Endorsement Effective        JANUARY 31, 1992

                                                                    (12:01 A.M.)

                              Countersigned _____

                                                         (Authorized Representative)

by TRANSAMERICA INSURANCE COMPANY, Woodland Hills, California

RENEWAL ENDORSEMENT

This Policy is changed to provide:

For the period January 31, 1992 to January 31, 1993, the following Declaration items are amended as shown below:

ITEM 4   – Company's Limit of Indemnity Each Occurrence
             (a) For Workers Compensation:                    $ 10,000,000
             (b) For Employers Liability Endorsement #1        $    500,000
             (c) For Workers Compensation & Employers Liability Combined:   $ 10,000,000

ITEM 5   – Insured's Retention Each Occurrence: $250,000

ITEM 6   – Business Operations of Insured      (a)    Estimated Annual Remuneration:     $   59,053,427
                                               (b)    Total Estimated Earned Normal Premium:    $222,684
                                                      TOTAL ESTIMATED MONTHLY PREMIUM   4,555,535  4/2
ITEM 7   – Policy Premium: $222,684                   Advance Premium for this Policy:    $222,684   BEING
             adjustable at .3800 per $100 of Payroll                                                CORRECTED

ITEM 8   – Minimum Premium for this Policy: $222,684

ITEM 9   – Additional Endorsements forming part of Policy at time of Renewal: WTA-32E

This Endorsement will not vary, alter or extend any agreement, provision, condition or declaration of the Policy other than as stated above.

12/04/92   10:45   FAX 1 908 ... 2440        RASMUSSEN

Endorsement No. _____ 5 _____

This Endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein. (The following information is required only when this Endorsement is issued subsequent to preparation of the Policy).

INSURED ____ NEW JERSEY TURNPIKE AUTHORITY ____

Policy No. ___ W-141828A ___          Endorsement Effective ___ JANUARY 21, 1992 ___
                                                              (12:01 A.M.)

                        Countersigned _____

                                              (Authorized Representative)

by TRANSAMERICA INSURANCE COMPANY, Woodland Hills, California

DECLARATIONS AMENDATORY ENDORSEMENT

This Policy is changed to provide:

ITEM 6 of the Declarations, Business Operations of Insured, is amended to read:

        (b) Total Estimated Earned Normal Premium   $4,559,535

This Endorsement will not vary, alter or extend any agreement, provision, condition or declaration of the Policy other than as stated above.

Endorsement No. _____ 6 _____

This Endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein. (The following information is required only when this Endorsement is issued subsequent to preparation of the Policy).

INSURED _____ NEW JERSEY TURNPIKE AUTHORITY _____

Policy No. _____ W-141626A _____     Endorsement Effective _____ JANUARY 21, 1993 _____
                                                                              (12:01 A.M.)

Countersigned _____

                                                                    (Authorized Representative)

by TRANSAMERICA INSURANCE COMPANY, Woodland Hills, California

## AUDIT ADDITIONAL PREMIUM ENDORSEMENT

This Policy is changed to provide:

In consideration of an additional premium of $4,082 it is understood and agreed that the following is the final premium adjustment for the period January 21, 1992 to January 21, 1993:

| | |
|---|---|
| Actual Exposure | $ 90,686,487 |
| Rate | .2500 |
| Earned Premium | $ 226,716 |
| Less Advance Premium | $ 222,634 |
| Additional Premium | $ 4,082 |

This Endorsement will not vary, alter or extend any agreement, provision, condition or declaration of the Policy other than as stated above.

WTA-05 (7/90)

# SPECIFIC EXCESS WORKERS COMPENSATION
## AND EMPLOYERS LIABILITY POLICY

In consideration of the payment of the premium, in reliance upon the statements in this Declarations made part of this Policy and subject to its terms, the Company named in the Declarations agrees with the Insured also named in the Declarations (herein called the Insured) as follows:

## PART 1. COVERAGE

**Self-Insured Indemnity Coverage.** The Company will indemnify the Insured for loss resulting from an occurrence during the contract period provided either:

(1) such loss would be covered under the Insured's qualified self-insured retention plan in those states named in Item 3 of the Declarations or;

(2) such loss would be compensable under the Workers Compensation Act of any state for employees injured who are normally employed in a state named in Item 3 of the Declarations and then only for that portion of loss, not exceeding the benefits in the state in which the injured employees are normally employed.

However, if the Insured is subject to the Workers Compensation Act when not a duly qualified self-insurer for a loss that would otherwise be covered by this Agreement, the Company will indemnify the Insured for such loss not exceeding the amount which would have been paid had the Insured been a duly qualified self-insurer.

**Employers Liability Indemnity Coverage.** The Company will indemnify the Insured for loss resulting from an occurrence during the contract period on account of the Insured's liability for damages because of bodily injury or occupational disease sustained by employees normally employed in a state named in Item 3 of the Declarations. This Agreement shall not indemnify the Insured for loss:

(1) for any amount exceeding that which the Insured would have sustained had the Insured not rejected the Workers Compensation Act of any state named in Item 3 of the Declarations, or any part of such act, or

(2) resulting from damages imposed in any lawsuit brought in, or any judgement rendered by any court outside the United States of America, its territories or possessions, or Canada, or to any action on such judgements, wherever brought.

## PART 2. RETENTION AND LIMIT OF INDEMNITY

No indemnity shall be afforded under this Policy, unless and until the Insured shall first have sustained loss as a result of each occurrence in excess of the amount of the Retention stated in Item 5 for the types of coverage involved of the Declarations. The Company hereby agrees to indemnify the Insured against loss as a result of each occurrence in excess of such Retention, subject to

the Limit of Indemnity provided for in Item 4 for the types of coverage involved of the Declarations.

The Company shall indemnify the Insured for claim expenses for loss in excess of the Retention in the same proportion as the amount of the loss paid by the Company in excess of the Retention bears to the total amount of such loss.

## PART 3. EXCLUSIONS

This Policy shall not apply to:

(A) punitive or exemplary damages, fines or penalties assessed against or imposed upon the Insured:

(1) on account of bodily injury or occupational disease sustained by any employee; or

(2) because of the conduct of the Insured or any of its agents (a) in the investigation, trial or settlement of any claim for which coverage is afforded under Part 1 of the Agreement, or b) in failing to pay or delaying the payment of any such benefits or damages; or

(3) on account of violation of any statute or regulation;

(B) loss arising out of any operation with respect to which the Insured carries primary workers compensation or Employers Liability insurance coverage;

(C) under Employers Liability Indemnity Coverage in Part 1 of this Policy,

(1) liability assumed by the Insured under any contract or agreement, or

(2) any obligation for which the Insured or any carrier as his Insurer may be held liable for any Workers Compensation, Unemployment Compensation or Disability benefits law, or under any similar law.

## PART 4. DEFINITIONS

### DEFINITIONS; THE TERM:

(a) "bodily injury" shall include death resulting therefrom, but shall not include occupational disease;

(b) "claim expense" shall mean court costs, interest upon awards and judgements, and investigation, adjustment and legal expenses that are actually paid by the Insured as respects loss. However, the term "claim expenses" shall not include loss, salaries paid to employees of the Insured nor shall it include fees and retainers paid to the Insured's service organization;

(c) "employee" shall mean, any person performing work which renders the Insured liable under the Workers Compensation Act of a state named in Item 3 of the Declarations, or under the common law of any such state;

(d) "Insured's service organization" shall mean an agent of the Insured paid to service or administer the Insured's self-insured workers compensation and/or employers liability program;

(e) "loss" shall mean only such amounts as are actually paid by the Insured in payment of benefits under the applicable Workers Compensation Act, (or in settlement of its Employers Liability Insured hereunder) in settlement of claims, or in satisfaction of awards or judgements. However, the term "loss" shall not include court costs, interest upon awards or judgement, investigation, adjustment and legal expenses, salaries paid to employees of the Insured, nor fees and retainers paid to the Insured's service organization;

(f) "occupational disease" shall include:   (1) death resulting therefrom. (2) and cumulative injuries;

(g) "occurrence", as applied to bodily injury, shall mean "accident". Occupational disease sustained by each employee shall be deemed to be a separate occurrence and occurrence shall be deemed to take place on the date upon which the employee is last exposed at work to conditions allegedly causing such occupational disease;

(h) "remuneration" shall mean payroll developed in accordance with the rules set forth in the applicable Manual of Workers Compensation and Employers Liability Insurance;

(i) "standard premium" shall mean the premium computed by applying the agreed rates specified in Item 6 of the Declarations to the remuneration applicable in the states named in Item 3 of the Declarations;

(j) "state" shall mean any state of the United States of America and the District of Columbia;

(k) "statutory" shall mean loss in excess of any retention applicable to this Agreement;

(l) "Workers Compensation Act" shall include any separate occupational disease act, but shall not include the non-occupational disability benefit provisions of any such act.

## PART 5.  CONTRACT PERIODS

The term "normal contract period" shall mean the period of time between 12:01 AM on the effective date of this Policy, and 12:01 AM on the expiration date, as specified in the Declarations.

The term "fractional contract period" applies only in case this Policy is cancelled effective at a date other than the end of the normal contract period, and shall mean that period of time between 12:01 AM on the effective date of this Agreement and 12:01 AM on the cancellation date of this Policy.

## PART 6.  POLICY PREMIUM

As of the effective date stated in Item 2 of the Declarations, the Insured shall pay to the Company the Advance Premium specified in Item 7 of the Declarations, which Advance Premium shall be held for the Insured's account and shall be allowed as a credit against earned Policy Premium for the contract period.

Within 45 days after the end of the contract period, the Insured shall render to Wexford Underwriting Managers, Inc., a payroll report upon a form satisfactory to Wexford Underwriting Managers, Inc., showing by classification the amount of remuneration earned by employees during the contract period, plus computations of the standard premium and the earned Policy Premium for the contract period (the latter obtained by adjusting Policy Premium as specified in Item 7 of the Declarations).

The Insured shall pay to the Company the excess, if any, of the earned Policy Premium over the Advance Premium paid at the beginning of the contract period.  If such Advance Premium exceeds such earned Policy Premium, the Company shall return to the Insured the amount of such excess, subject to the Minimum Premium applicable to the normal contract period, as specified in Item 8 of the Declarations.

In no event, however, shall the Policy Premium due the Company, in respect to the normal contract period be less than the applicable Minimum Premium specified in Item 8 of the Declarations.  The Policy Premium due the Company in respect of the fractional contract period resulting in case this Policy is cancelled effective at a date other than the end of a normal contract period shall be set forth in Part 14 of the Policy, Cancellation.

## PART 7.  ADMINISTRATION AND REPORTING OF CLAIMS

The Insured shall be responsible for the investigation, settlement, defense or appeal of any claim made or suit brought, or proceeding instituted against the Insured and shall give immediate notice to Wexford Underwriting Managers, Inc., upon learning of any of the following:

(a) any claim, suit or proceeding that appears to involve indemnity by the Company;

(b) any occurrence, claim, award or proceeding judgement which exceeds 50% of the Retention stated in Item 5 of the Declarations;

(c) any occurrence which causes serious injury to two or more employees;

TAW – 03 (1/89)

(d) any case involving:

  (1) amputation of a major extremity;

  (2) brain or spinal cord injury;

  (3) death;

  (4) disability for a period of nine months or more;

  (5) permanent total disability as defined in the Workers Compensation Act of the applicable state named in Item 3 of the Declarations;

  (6) any second or third degree burn of 25% or more of the body.

(e) the reopening of any case in which further award might involve liability of the Company.

The Insured shall make no voluntary settlement involving loss to the Company except with written consent of Wexford Underwriting Managers, Inc.

The Insured shall forward promptly to Wexford Underwriting Managers, Inc., any information it may request on the individual occurrences, claims or cases. The Insured shall render to Wexford Underwriting Managers, Inc., within 45 days of the end of the contract period an experience report, upon a form satisfactory to Wexford Underwriting Managers, Inc., showing in detail the amounts disbursed during the contract period in settling claims and the estimated future payments on, or reserves for, outstanding claims.

The Company, at its own election and expense and in addition to any indemnity for claim expenses provided by this Policy, shall have the right but not the duty to participate with the Insured in, or to assume in the name of the Insured control over, the investigation, settlement, defense or appeal of any claim, suit or proceeding which might involve liability of the Company.

## PART 8.  LOSS PAYABLE

The company will indemnify the Insured for any loss for which it may be liable under this policy as follows:

(a) As respects PART 1, Coverage, Self Insurers Indemnity Coverage, payment shall first be made by the Insured for all benefits required of the Insured under Workers Compensation Law and the Company shall reimburse the Insured at monthly intervals after the Company has received proofs of payment by the Insured. Workers Compensation awards that may involve the Company may not be settled on a lump sum basis without prior written consent of the Company.

(b) As respects PART 1, Coverage, Employers Liability Indemnity Coverage, payment shall first be made by the Insured for damages for which the Insured is legally liable. The Company will reimburse the Insured within 30 days after the Insurer has received proof of payment by the Insured.

TAW - 02 (1/89)

## PART 9.  SUBROGATION AND SALVAGE

The Insured shall prosecute any and all claims it may have against any person, firm or corporation arising out of any occurrence resulting in the payment of loss and claim expenses. All recoveries therefrom shall be applied to reduce the loss and claim expenses to which this Policy applies, after deducting from such recoveries the expenses incurred in effecting such recoveries. If the Company shall have sustained a loss or claim expenses on account of such occurrence, such net amount of the recovery as does not exceed the Company's loss and claim expenses shall be paid to the Company.

If the Insured has such a claim against any person, firm or corporation, which it fails or neglects to pursue or enforce within the reasonable time, the Company shall be subrogated to such claim and the Insured shall execute any and all papers and documents necessary to vest full right, title and interest in the claim in the Company. The Company may prosecute the claim in its own name or in the name of the Insured. The Insured shall cooperate to the fullest extent with the Company in the enforcement of any such claim. The net proceeds derived from such claim shall first be used by the Company to pay its loss and claim expenses, and any excess shall be paid to the Insured.

## PART 10.  AUDIT AND INSPECTION

The books and records of the Insured and the books and records of all agents and representatives of the Insured (including the Insured's service organization), as far as they relate to the subject matter of this Policy, shall be open to the Company and its representatives at all times during the usual business hours of the Insured and within three years after the contract period ends or within three years after the final settlement of all claims or payments made under this Policy.

The Company shall be permitted, but not obligated to inspect the Insured's properties, operations or workplaces at any time. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the Insured or others, to determine or warrant that such properties, operations or workplaces are safe, or healthful, or are in compliance with any code, law, rule or regulation.

## PART 11.  OTHER INSURANCE

If any other excess insurance, reinsurance or indemnity exists protecting against loss or claim expenses covered by this Policy, the indemnity afforded by this Policy shall apply in excess of such other excess insurance, reinsurance or indemnity unless such other insurance, reinsurance or indemnity shall be arranged specifically to apply only in excess of this Policy.

## PART 12. ASSIGNMENT

No assignment of the Insured's interest hereunder shall be binding upon the Company.

## PART 13. NOTICE OR PAYMENT

If more than one entity is named in Item 1 of the Declarations, notices, stipulations and payments to or by the entity first named in Item 1 shall be binding upon all other entities named therein.

## PART 14. CHANGE OR WAIVER

The terms of this Policy shall not be waived or changed except by endorsement issued to form a part hereof, signed by a duly authorized representative of the Company.

## PART 15. CANCELLATION

Either the Company or the Insured may cancel this Policy at any time by giving written notice by registered mail to the other party. Such notice shall provide at least the number of days cancellation notice set forth in Item 2 of the Declarations, stating when cancellation shall be effective. However, if cancellation notice is not set forth in Item 2 of the Declarations, cancellation notice shall not be less than 30 days or such greater time as may be required by state law. This Policy does not apply to loss and claim expenses as a result of occurrence taking place after the effective date of such cancellation.

This policy may also be cancelled by the Company for non-payment of any unpaid portion of the premium by giving written notice by registered mail to the Insured at the address shown in Item 1 of the Declarations, stating when, but not less than 10 days thereafter cancellation shall be effective.

If this Policy is cancelled prior to the expiration date stated in the Declarations, the Policy Premium for the fractional contract period shall be computed following the procedure set forth in Part 6 of this Policy, Policy Premium, except;

(a) if such cancellation is at the request of the Company, or at the request of the Insured when actually retiring from the business described in the application and specified in the Declarations, the Policy Premium shall be either the earned Policy Premium obtained by applying the adjustment specified in Item 7 of the Declarations to the standard premium for such fractional contract period, or the pro rata portion of the Minimum Premium for the normal contract period, as specified in Item 8 of the Declarations, whichever is greater;

(b) if such cancellation is at the request of the Insured, when not retiring as provided for above, the Policy Premium shall be either the earned Policy Premium obtained by applying the rates specified in Item 7 of the Declarations of the adjusted standard premium for such fractional contract period and further adjusted in accordance with the customary short rate table and procedure or the short rate portion of the Minimum Premium for the normal contract period, as specified in Item 8 of the Declarations, whichever is greater.

Tender of earned or unearned Policy Premium by either party to this Policy shall not constitute a condition precedent to the effectiveness of cancellation as herein provided.

## PART 16. ACCEPTANCE

By acceptance of this Policy the Insured agrees that the statements in the Declarations are the Insured's agreements and representations; that this Policy embodies all agreements existing between the Insured and the Company or any of its agents relating to this Policy; and that full compliance by the Insured with all the terms of this Policy is a condition precedent to the Company's liability hereunder.

In Witness Whereof, the Company has caused this Policy to be signed by its President and Secretary, but the Policy shall not be binding upon the Company unless the attached Declarations bearing the Policy Number is countersigned by a duly authorized representative of the Company.

**Transamerica Insurance Company**

_____
President

_____
Secretary

TAW – 02 (1/80)

EXHIBIT 2

NEW JERSEY DEPARTMENT OF LABOR AND INDUSTRY
DIVISION OF WORKERS' COMPENSATION
NEW BRUNSWICK, MIDDLESEX COUNTY DISTRICT

- - - - - - - - - - - -
MICHAEL FAAS,                    :

       Petitioner,          :

   vs.

                :

NEW JERSEY TURNPIKE
        AUTHORITY            :
        Respondent.

                :

CLAIM PETITION
93-031753

JUDGES DECISION

- - - - - - - - - - - -
JUNE 12, 1998

B E F O R E:
    THE HONORABLE LAWRENCE T. MARINARI
    Judge of Compensation

A P P E A R A N C E S:

    JULIUS FEINSON ESQ.,
    Attorney for the Petitioner.

    MORGAN, MELHUISH, MONAGHAN, ARVIDSON,
    ABRUTYN & LISOWSKI, ESQS.
    BY:  WILLIAM. F. PERRY, ESQ.
    Attorneys for the Respondent.

Ozena B. Upsher
Shorthand Reporter

WILLIAM C. O'BRIEN ASSOCIATES
155 WASHINGTON STREET
NEWARK, NEW JERSEY 07102
(201) 642-7550

# I N D E X

JUDGES DECISION Page 3

## E X H I B T S

| NOS. | DESCRIPTION | IDENTIFICATION | EVIDENCE |

3

1   THE JUDGE:  This matter being presented to the

2   Court having been a fully tried matter.  There was

3   also an application made to join the Second Injury

4   Fund and they were joined in this case.

5      I have had the opportunity to review the

6   evidence that has been presented, including all of

7   the testimony of all of the parties.

8      Petitioner was in the employ and it had been

9   stipulated he was exposed to a significant but

10  unknown chemical spill while in the employ of the

11  Turnpike Authority.  He has never returned to work

12  because of that spill.  He had a significant

13  exposure to these chemicals which had affected

14  petitioner's breathing capacity in his lungs.

15     All of the doctors have admitted that

16  petitioner has a pulmonary disability. I've had the

17  opportunity to review the petitioner.  He is on

18  constant inhalers and walked in with inhalers and

19  walked in with breathing apparatus.  You can hear

20  his difficulty in breathing.  He can not walk for

21  more than a block.  He has difficulty with taking

22  any kind of deep breath.  He coughs on a constant

23  basis, including a very productive cough, that has

24  caused him, because of the severity of the coughs,

25  to fracture his ribs.  He needs two pillows to sleep

WILLIAM C O'BRIEN ASSOCIATES

**4**

1  at night.  He wheezes constantly, his eyes looks

2  irritated.  He is on a significant amount of

3  medications including Atrovent, Proventil,

4  Prednisone, Theo-dur, Vanceril, Hydromet, Pulmaid

5  with Albuterol, pulmonary medications, antibiotics,

6  Claritin D, Zantac, Theophyline and Elavil.

7      The true issue in this case is whether or not

8  the petitioner had any preexisting conditions that

9  would allow the Second Injury Fund to become a part

10  of the case.  While the evidence before me does

11  indicate that there was some preexisting pulmonary

12  disability, it is certainly not clear to me that

13  that disability was in fact any or at all the

14  proximate cause of this petitioner inability to

15  work.  Dr. Hermele testified before me at length.

16  He testified that he found that the petitioner was

17  totally disabled and that disability was primarily

18  caused or in total caused by this petitioners'

19  exposure at work.

20      There are significant medical records produced

21  from Saint Peter's Medical Center showing this

22  petitioner has had significant pulmonary disability

23  since that time, and while normally I would be

24  hesitant in not giving a credit in this matter the

25  burden of proof is on the respondent, and the

5

1    respondent's doctor. I wholly reject his evaluation
2    of the petitioner. He has indicated a disability
3    which frankly makes absolutely no since to me and on
4    cross-examination conceded that the petitioner was
5    probably totally disabled but he could not
6    substantiate the reasons for his disability or the
7    reason for his increase in disability after three
8    examinations.   His   whole   theory   frankly   was
9    implausible and I had difficulty following his
10   theories of pulmonary disability, until he finally
11   admitted on cross-examination that the complaints,
12   if he believed the complaints, that the petitioner
13   had would be totally disabled.

14       I have never seen a pulmonary case quite as
15   impressive as the disability that this gentleman
16   certainly has. He has had a significant amount of
17   problems over the last number of years. He is
18   emotionally crippled because of these disabilities.
19   His life has been stopped short at a young age and
20   frankly   beyond   any   of   his   control.   It   is
21   unfortunate that this gentleman has been left with
22   this disability that I found.

23       The petitioner is suffering a total disability
24   and that disability has been solely caused by the
25   exposure while in the employ of New Jersey Turnpike

WILLIAM C O'BRIEN ASSOCIATES

6

1  Authority.  This matter should have been resolved at

2  the pre-trial stage.  If any one were to have truly

3  reviewed the treating doctor reports alone, given

4  the reliance on the experts in this matter, I find

5  it to be almost incredible that any one believes

6  that this person is not totally disabled.

7      There has been a third party recovery in this

8  matter in the sum of $250,000 the respondent

9  liability however is $184,000.  And therefore the

10  sum pursuant to credits, pursuant to Section 40 of

11  our act, that total liability is 450 weeks at $409

12  a week, the petitioner would therefore receive one

13  third of that or $61,350.  All authorized medical

14  treatment has been paid for.

15      I will allow Dr. Hermele $450 for his

16  examination and report.  I will allow Mr. Feinson a

17  maximum fee assessed against the respondent in this

18  matter for $20,500.  I will indicate for the record

19  that this has been solely assessed against the

20  respondent.  The respondent should have shouldered

21  their responsibility earlier in this matter.  They

22  should have prosecuted this case in a more diligent

23  manner and certainly should have reviewed the

24  outstanding medical treatment in this case to come

25  to a quicker resolution.  They prolonged the

7

1   litigation in this matter.  They made Mr. Feinson

2   try this case to the end, which in fact it could

3   have been done in a much more abbreviated, but more

4   importantly, timely manner.  The benefits have been

5   denied to this individual, not because of anything

6   of petitioners' fault or petitioners' counsel,

7   according I am making the full assessment in this

8   matter against the respondent because I've taken

9   their actions into consideration in assessment in

10  this fee.  I have allowed a full fee in this matter

11  because the complete exposure was $184,000.  The

12  third party case was not handled by this

13  attorney and I believe it is appropriate to allow

14  full fee in this matter.

15       There will be a $900 stenographic fee payable

16  by the respondent.

17       I will make no assessment against the

18  petitioner in this matter.  I have entered an order

19  and the contents of which are made a part of the

20  record without me stating them in total for the

21  record.  A copy is being hereby entered by me and we

22  will be disseminated to all parties.  Thank you.

23       There will be a dismissal of the Fund

24  application also entered and provided to the Fund

25  attorney by petitioner's attorney.

**WILLIAM C O'BRIEN ASSOCIATES**

# C E R T I F I C A T E

- - - - - - - - - - - -
MICHAEL FAAS,                    :

     Petitioner,     :

vs.                             :               CLAIM PETITION
                                                93-031753
NEW JERSEY TURNPIKE
    AUTHORITY               :
    Respondent.
- - - - - - - - - - - :


     I OZENA B. UPSHER, being Notary Public of the

State of New Jersey, hereby certify that the foregoing is a

true and accurate transcript of my stenographic notes to the

best of my ability, at the place and on the date

hereinbefore set forth.

                               Ozena B. Upsher
               Shorthand Reporter and Notary Public

# EXHIBIT 3

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
A-6873-97T3

MICHAEL B. FAAS,

    Petitioner-Respondent,

    v.

NEW JERSEY TURNPIKE AUTHORITY,

    Respondent-Appellant,

    and

SECOND INJURY FUND,

    Respondent-Respondent.



FILING DATE
APPELLATE DIVISION

JAN 19 2000

Submitted November 30, 1999 - Decided    JAN 19 2000

Before Judges Kimmelman and Arnold.

On appeal from the Department of
Labor, Division of Workers' Compensation.

Morgan, Melhuish, Monaghan, Arvidson,
Abrutyn & Lisowski, attorneys for
appellant (Alan L. Harwick, on the brief).

Julius J. Feinson, attorney for
respondent Michael B. Faas.

John J. Farmer, Jr., Attorney General,
attorney for respondent Second Injury Fund
(Mary C. Jacobson, Assistant Attorney
General, of counsel; Dolores M. McNamee,
Deputy Attorney General, on the brief).

PER CURIAM.

    The New Jersey Turnpike Authority (the "Authority") appeals

from a workers' compensation decision rendered June 17, 1998, which awarded 100% permanent and total disability to respondent Michael B. Faas, the petitioner in the workers' compensation proceeding below, and which dismissed a claim against the Second Injury Fund (the "Fund"). We affirm.

Faas was a toll collector at the Authority for approximately eight years prior to a workplace accident which occurred on Friday, September 25, 1992. Before becoming employed by the Authority, Faas, for some fourteen years, had worked as a house painter and had done carpentry work. In 1986 or 1987, while working for the Authority, Faas suffered a back injury which resulted in a herniated disc. He had no surgery for his back condition nor did he receive a workers' compensation award.

At about 9:00 a.m. on September 25, 1992, Faas was working collecting tolls at Exit 7 when a tanker-truck passed through the toll lane to his left. As the truck was pulling away, Faas noticed fluid coming out of the bottom of a valve. Although Faas did not detect any particular odor from the fluid, about one-half hour later his eyes began to tear and his voice became hoarse. He notified the adjacent office of his physical problems and was advised to come inside as there had been a chemical spill. Three other employees along with Faas were sent to a local hospital. Faas was kept under observation for a few hours because of his breathing problem and was then sent home.

On the weekend following the accident, Faas was scheduled to

work but was unable to do so because of continued breathing problems. His voice remained hoarse, his throat was sore, and his eyes continued to tear. On Monday, September 28, 1992, Faas reported to work because he was scheduled to begin work in the Authority's carpentry shop, which job represented a promotion. After about a week in the carpentry shop, however, Faas stopped working because his condition had progressively worsened. He became short of breath after walking but a few feet. Faas informed his immediate supervisor of his problem, and on October 7, 1992, he stopped working for the Authority. He has not worked since.

About ten days after the accident, Faas came under the care of a pulmonologist and over the next few years he underwent various tests at a local hospital. As a result of violent coughing attacks, Faas suffered fractured ribs three times between October 1995 and January 1996. To date, Faas suffers from a significantly impaired pulmonary function, chronic bronchitis, and emphysema. He currently takes a host of medications ranging from pulmonary steroids and inhalers to anti-depressants.

At the hearing below, the Authority admitted that a workplace accident happened but disputed that the Authority was solely responsible for Faas's condition. The Authority contended that because a 1989 pulmonary function test performed by a staff nurse at the Authority indicated that Faas had an impaired pulmonary condition, the Fund should be responsible for the extent of Faas's incapacity attributable to that pre-existing condition.

3

The physicians for both Faas and the Authority agreed that according to his complaints Faas was 100% permanently and totally disabled on the basis of his pulmonary disability alone. Testifying for Faas, Dr. Hermele attributed the disability to exposure and inhalation of the unknown chemical fumes on September 25, 1992. According to Dr. Hermele, the September 25 incident was the causative agent for Faas's lung disease. Dr. Hermele was of the initial opinion that, based upon the 1989 pulmonary function test, Faas's condition could have been partially attributable to his long history of smoking. However, he was firmly of the opinion that the 1989 pulmonary function test stood in a vacuum and should not be given significant weight because there was no evidence that the machine was properly calibrated, that the test was properly administered or whether Faas may have been suffering from a cold at the time. The doctor also took into account that Faas had denied that he had experienced any pulmonary problems before the 1992 accident.

The Authority's physician, Dr. Schisano, opined that Faas suffered from a pre-existing pulmonary disability of 15% of partial permanent total which was attributable to Faas's prior smoking history. Dr. Schisano's final estimate after the 1992 accident was 25% partial permanent pulmonary disability. However, he acknowledged that if he were to accept Faas's complaints as true, Faas would be unable to work and the disability would be 100%.

Worker's Compensation Judge Marinari found Faas to be 100%

4

permanently and totally disabled solely as a result of the September 25, 1992, compensable accident thus relieving the Fund of any liability. While the judge acknowledged the probable existence of a pre-existing disability, he noted "it is certainly not clear to me that the disability was in fact any or at all the proximate cause of [Faas's] inability to work."

The burden was upon Faas to prove his case by a preponderance of probabilities. Dwyer v. Ford Motor Co., 36 N.J. 487, 493-94 (1962). Once Faas satisfactorily proved a disability, the Authority had the right to seek to confer a portion of its liability on the fund. However, the burden of proof was upon the Authority in seeking a credit for a pre-existing disability. Lewicki v. N.J. Art Foundry, 88 N.J. 75, 84 (1981); Gulick v. H.M. Enoch, Inc., 280 N.J. Super. 96, 111 (App. Div. 1995).

The Authority contends that sufficient evidence was proffered to support a finding that Faas's disability was a result of a combination of a pre-existing condition as well as his last exposure. Nevertheless, the workers' compensation judge rejected Dr. Schisano's evaluation of Faas's condition and accepted as a fact that whatever pre-existing disability Faas may have had neither impaired his ability to work nor affected his personal lifestyle. See Perez v. Pentasote, 95 N.J. 105, 116-18 (1984); Katz v. Township of Howell, 68 N.J. 125, 128-29 (1975).

As the Supreme Court explained in Katz v. Township of Howell, supra, 68 N.J. at 132, the legislative policy is that if the injury

5

from the compensable workplace accident is severe enough to produce total disability, then the employer "should not enjoy a windfall of Fund relief . . . by mere reason of the fact that prior conditions or disabilities may also be contributive to the actual ultimate condition of the workman." See also N.J.S.A. 34:15-95. In short, it was determined that the Authority did not sustain its burden of proof.

Our standard of review in a workers' compensation case is to determine whether the findings are supported by sufficient credible evidence in the record as a whole, giving due regard to the judge's expertise in the field and the opportunity to hear and see the witnesses. Close v. Kordulak Bros., 44 N.J. 589, 598-99 (1965); Perry v. State, Dept. of Law and Public Safety, Div. of State Police, 296 N.J. Super. 158, 161 (App. Div. 1996), certif. granted, 149 N.J. 143 (1997), aff'd and remanded 153 N.J. 249 (1998); Dietrich v. Toms River Bd. of Educ., 294 N.J. Super. 252, 260-61 (App. Div. 1996), certif. denied, 148 N.J. 459 (1997). "Deference is given to the findings and legal determinations of the trial judge unless 'they are "manifestly unsupported by or inconsistent with competent, relevant and reasonably credible evidence as to offend the interests of justice."'" Dietrich, supra, 294 N.J. Super. at 261 (quoting Perez v. Monmouth Cable Vision, 278 N.J. Super. 275, 282 (App. Div. 1994), certif. denied, 140 N.J. 277 (1995) (quoting Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974))).

6

Based upon our review of the record and the evaluation of the testimony, we see no reason to disturb Judge Marinari's findings and conclusions.   We also reject the Authority's contention that the counsel fee awarded to Faas's attorney was excessive.   The judge did not abuse his discretion.   The fee of $20,500 assessed against the Authority was well within the 20% guideline of N.J.S.A. 34:15-64.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

Clerk

7

EXHIBIT 4

C.O.O

March 3, 2000

Wexford Underwriting Managers, Inc.
40 Fulton Street
23rd Floor
New York, NY 10038-3714
 Attn: Joseph J. Griswold, Jr.
      Regional Claims Manager

Re: Insured/Client: New Jersey Turnpike Authority
     Injured Worker: Michael Faas
     Date of Loss: 9/25/92
     Our Claim No: W2592-47003

Dear Mr. Griswold:

Please accept this letter as our initial status report with regard to the above referenced
New Jersey Workers' Compensation matter.

DESCRIPTION OF ACCIDENT:

To briefly summarize this claim, the injured worker/petitioner was working as a toll
collector on the above date of accident, when there was a chemical spill in the toll lanes. A
total of four employees were taken to the hospital but Mr. Faas was the only employee
who did not return to work immediately. After reviewing the petitioner's medical records
the claim was denied, as it was found the petitioner had a pre-existing pulmonary
condition which was documented on 10/20/89 by Dr. Sherbin, the Turnpike Authority's
Medical Director during that time.

CLAIM SUMMARY:

The petitioner eventually filed a claim petition alleging permanent pulmonary disability due
to the chemical spill. This claim petition was defended on behalf of the Turnpike Authority
by the law firm Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski. The case
proceeded to trial and on June 12, 1998 Judge Marinari awarded the petitioner 100% of
total permanent disability or 450 weeks at $409.00 per week for a total award of
$184,000. Since the petitioner had received a third party award, through an uninsured
motorist claim, in the amount of $250,000, the Turnpike Authority would have been
responsible for one-third of the award, or $61,350. This sum would have been payable to

page 2

the petitioner at the rate of $136.33 per week or 450 weeks from the date the petitioner became totally disabled on, April 1, 1993, and thereafter, as a result of the Social Security reduction of $370.34 per week until approximately February 8, 2014, and thereafter, at the rate of $409 per week until the petitioner dies. The judge also assessed costs of medical and counsel fees totally against the Turnpike Authority with no contribution from the petitioner. The judge also refused to assess any disability against the Second Inury Fund despite the fact that he had earlier convinced them to accept 10% of the disability. If the Second Injury Fund had been brought into the case as expected, it would have certainly limited the amount of the Turnpike Authority's contribution in this matter.

Following this decision, it was decided that defense counsel would file an appeal, which they did within the 45 day appeal period. During the appeal process, the New Jersey Turnpike Authority Commissioners authorized payment in full of the permanent disability awarded, less the section 40 credit as a result of the 3rd party case. The petitioner would have been entitled to this payment regardless of the outcome of the appeal. The payment was for the original 450 weeks and covered the period 4/1/93-11/16/01.

The Appellate Division ruled on the application to reverse the decision of Judge Marinari on 1/19/00. At that time they upheld the decision of Judge Marinari and indicated that the medical testimony supported a finding of 100% total disability based upon the pulmonary condition of the petitioner. In applying the case law, the Appellate Division found that from the testimony adduced at trial, there was simply not sufficient evidence that the pre-existing disability the petitioner did have affected his ability to work or his personal lifestyle.

Based upon the decision of the Appellate Division, our defense counsel felt that no further action should be taken in the appeals process and that the balance of the petitioner's benefits should be paid, along with the counsel fee owed to the petitioner's attorney.

Since the petitioner has been paid up to 11/16/01, there will be no further payments made to him until the first 4 week period following 11/16/01. At that time we will begin making payments to the petitioner in the amount of $136.33 per week for 161 2/7 weeks or 11/16/01-12/19/04. Beginning on 12/20/04, we will begin paying the petitioner at the social security offset rate of $370.34 per week. We will continue to pay benefits at this offset rate until the petitioner reaches the age of 62 on 2/8/14. Thereafter, payments will be made to the petitioner at the full total rate of $409.00 per week for the rest of his life.

This claim should not pierce the SIR until sometime after December 13, 2011.

page 3

RESERVES:

|  | Incurred | Paid | Outstanding |
|---|---|---|---|
| Medical | $837 | $837 | 0 |
| Indemnity | $259,832 | $82,300 | $177,532 |
| Expenses | $12,500 | $12,173.42 | $326.58 |
| Totals | $273,169 | $95,310.42 | $177,858.58 |

REMARKS:

At this time we are going to place this file on a 90 day diary but since the next payment is not due until after 11/16/01, we would ask that you please advise as to what type of diary you would like us to keep this file on in terms of reporting to your office.

We would like to take this opportunity to thank you for your cooperation and would ask that you please contact the undersigned with any questions or comments regarding the above.

Very truly yours,

John Walker
Account Claims Rep
856-727-3055

enc.

cc: Harris Galary, NJTPA

EXHIBIT 5



**WEXFORD UNDERWRITING MANAGERS, INC.**

JOSEPH J. GRISWOLD, JR.
*Assistant Vice President • Claims*

RECEIVED
MAR 17 '00

W 2592 - 47003

March 13, 2000

John Walker
PMA Group
100 Century Park Way
Century Corporate Center
Mt. Laurel, NJ 08054

| | |
|---|---|
| **INSURED:** | **NEW JERSEY TURNPIKE AUTHORITY** |
| **CLAIMANT:** | **FAAS, MICHAEL** |
| **POLICY NO.:** | **W-141626A** |
| **DATE OF LOSS:** | **09/25/1992** |

Dear John:

Thank you for notification of this claim. Based on the information you have provided we have decided to monitor the claim as an Incident file.

Should any changes occur, please contact us immediately. In the interim, please provide a status report every twelve months until instructed otherwise.

Very truly yours,

Joseph J. Griswold, Jr.

JJG/rob

cms_d09.doc

EXHIBIT 6

10/14/2005 02:57 PM A9FBE_24186

C.O.O

X 3 B L 4B

30 epm 0920

July 29, 2002

Wexford Underwriting Managers, Inc.
40 Fulton Street
23rd Floor
New York, NY 10038-3714
  Attn: Joseph J. Griswold, Jr.
        Regional Claims Manager

Re: Insured/Client: New Jersey Turnpike Authority
    Injured Worker/Petitioner: Michael Faas
    Date of Loss: 9/25/92
    Our Claim No: W2592-47003
    Policy No: W-141626A

Dear Mr. Griswold:

Please accept this letter as a status report on the above captioned New Jersey Workers'
Compensation matter.

DESCRIPTION OF ACCIDENT:

This injured worker/petitioner was working as a toll collector on the above date of
accident, when there was a chemical spill in the toll lanes. A total of four employees were
taken to the hospital but Mr. Faas was the only employee who did not return to work
immediately. After reviewing the petitioner's medical records the claim was denied, as it
was found the petitioner had a pre-existing pulmonary condition, which was documented
on 10/20/89 by Dr. Sherbin, the Turnpike Authority's Medical Director during that time.

CLAIM SUMMARY:

The petitioner eventually filed a claim petition alleging permanent pulmonary disability
due to the chemical spill. This claim petition was defended on behalf of the Turnpike
Authority by the law firm Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski.
The case proceeded to trial and on June 12, 1998 Judge Marinari awarded the petitioner
100% of total permanent disability or 450 weeks at $409.00 per week, for a total award of
$184,000. Since the petitioner had received a third party award through an uninsured
motorist claim, in the amount of $250,000, the Turnpike Authority would have been
responsible for one-third of the award, or $61,350. This sum would have been payable to
the petitioner at the rate of $136.33 per week or 450 weeks from the date the petitioner

Page 2

became totally disabled on April 1, 1993, and thereafter, as a result of the Social Security reduction of $370.34 per week until approximately February 8, 2014, and thereafter, at the rate of $409 per week until the petitioner dies. The judge also assessed costs of medical and counsel fees totally against the Turnpike Authority with no contribution from the petitioner. The judge also refused to assess any disability against the Second Injury Fund despite the fact that he had earlier convinced them to accept 10% of the disability. If the Second Injury Fund had been brought into the case as expected, it would have certainly limited the amount of the Turnpike Authority's contribution in this matter.

Following this decision by the judge, it was decided that defense counsel would file an appeal, which they did within the 45-day appeal period. During the appeal process, the New Jersey Turnpike Authority Commissioners authorized payment in full of the permanent disability awarded, less the Section 40 credit as a result of the 3rd party case. The petitioner would have been entitled to this payment regardless of the outcome of the appeal. The payment was for the original 450 weeks and covered the period 4/1/93-11/16/01.

The Appellate Division ruled on the application to reverse the decision of Judge Marinari on 1/19/00. At that time they upheld the decision of Judge Marinari and indicated that the medical testimony supported a finding of 100% total disability based upon the pulmonary condition of the petitioner. In applying case law, the Appellate Division found that from the testimony adduced at trial, there was simply not sufficient evidence that the pre-existing disability the petitioner did have affected his ability to work or his personal lifestyle.

Based upon the decision of the Appellate Division, our defense counsel felt that no further action should be taken in the appeals process and that the balance of the petitioner's benefits should be paid, along with the counsel fee owed to the petitioner's attorney.

Since the petitioner had been paid up to 11/16/01, there were to be no further payments made to him until the first 4 week period following 11/16/01. Those payments have now begun, and we are paying the petitioner $136.33 per week for 161 2/7 weeks or 11/16/01-12/19/04. The petitioner is currently receiving $545.32 per month. Beginning on 12/20/04, we will begin paying the petitioner at the social security offset rate of $370.34 per week. We will continue to pay benefits at this offset rate until the petitioner reaches the age of 62 on 2/8/14. Thereafter, payments will be made to the petitioner at the full total rate of $409 per week for the rest of his life.

10/14/2005 02:57 PM A9FBE_24186

Page 3

MEDICAL:

As you are aware, along with this award the Turnpike Authority is also responsible for future medical treatment required by the petitioner, for pulmonary related illnesses. Unfortunately, since receiving this award, the petitioner has required substantial medical treatment, which includes several hospital stays for chronic obstructive pulmonary disease. With an injury such as this, it is very difficult to separate what is related to his pulmonary disease from cardiac, kidney and diabetes, as they are all inner-related. That is why we immediately assigned one of our medial case managers to this claim after learning of the petitioner's recent medical problems.

The petitioner is stable at the moment and is not receiving treatment for any pulmonary related conditions at this time. However, it is possible that a relapse could occur at any time. We will continue to monitor this and if there is a relapse, our case manager will re-open her claim in order to manage the medical treatment.

There are voluminous medical records as a result of his current treatment, which we are not enclosing with this report, but will be glad to provide you with should you desire copies of the same. We are, however, enclosing a copy of our reserve sheet and payment ledger, so you can see the payments that have been made on this file for medical, indemnity and expenses.

RESERVES:

|  | Incurred | Paid | Outstanding |
|---|---|---|---|
| Medical | $300,000 | $253,523.26 | $46,476.00 |
| Indemnity | $259,832 | $87,207.88 | $172,624.12 |
| Expenses | $35,000 | $33,383.36 | $1,616.00 |
| Totals | $594,832 | $374,114.50 | $220,716.12 |

$340,731.14 – Indemnity & Medical paid
- $250,000.00 – Self Insured Retention (SIR)
= $90,731.14 – Reimbursement owed

REMARKS:

We will now place this file on a 90 day reporting diary and maintain the same for the life of this claim, unless otherwise instructed by your office. Again, please accept my apologies for the delay in forwarding this report to your office.

EXHIBIT 7



## WEXFORD UNDERWRITING MANAGERS, INC.

JOSEPH J. GRISWOLD, JR.
*Vice President • Claims*

July 31, 2002

John Walker
PMA Group
100 Century Parkway
Suite 300
Mt. Laurel, NJ 08054

| | |
|---|---|
| **INSURED:** | **NEW JERSEY TURNPIKE AUTHORITY** |
| **CLAIMANT:** | **FAAS, MICHAEL** |
| **DATE OF LOSS:** | **09/25/1992** |
| **YOUR CLAIM NO.:** | **W2592-47903** |
| **WEXFORD CLAIM NO.:** | **WC-141626-04** |

Dear John:

Thank you for your recent update regarding the above captioned claim. Based on our further review, we have established an open excess claim file and referred this to TIG for their opinion and recommendations.

On an ongoing basis, we may need copies of all medical, rehabilitation and investigative reports as well as any other pertinent information to enable us to properly evaluate this claim. I will let you know what is specifically required by TIG.

Going forward, please provide status reports on a quarterly basis. We would also appreciate being kept advised of all new developments and any changes as they arise.

Thank you for your continued assistance.

Very truly yours,

Joseph J. Griswold, Jr.

JJG/rob

40 FULTON STREET, TWENTY-THIRD FLOOR, NEW YORK, NEW YORK 10038-3714
TELEPHONE: 212-962-3030  FACSIMILE: 212-962-3086

EXHIBIT 8

C.O. SNS

XP7Z9E

October 8, 2002

New Jersey Turnpike Authority
PO Box 1121
New Brunswick, NJ 08903
  Attn: Harris Galary, Manager
          Safety & Benefits

Re: Michael Faas
      Date of Loss: 9/25/92
      Our Claim No: W2592-47003

Dear Mr. Galary:

With regard to the above matter, enclosed please find two checks from TIG Insurance
Company. The first check is for the amount of $90,731.14 and serves as reimbursement
for medical and indemnity paid over and above $250,000. The second check is for
$8,889.44 and is for prorata expense reimbursement. Please handle accordingly.

Very truly yours,

John Walker
Account Claims Rep
856-727-3055

enc.

00119

# TIG INSURANCE COMPANY

| Check Number | Date of Check | Reference Number |
|---|---|---|
| 612867504 | 10/02/02 | 6111002220039 |

| Policy Number | Claim Number | Region - Agent |
|---|---|---|
| 00141626 | 00B02052585 | 96-010 |

**Name of Insured**
NEW JERSEY TURN

**Location**
12A

**Employee/Claimant Name**
FAAS, MICHAEL

**Claims Office**
TRANSP. UNIT #1

| Date of Loss | Check Amount | Office Telephone Number |
|---|---|---|
| 09/25/92 | $90,731.14 | 800-448-8417 |

**Payee Name**
NEW JERSEY TURNPIKE AUTHORITY, ATTN JOHN WALKER/RE MICHAEL FAAS

**Payee Address**
C/O PMA 100 CENTURY PKWY MT LAUREL NJ 080545007

**In Payment of**
LOSS REIMBURSEMENT EXCESS SIR

| From Date | Through Date |
|---|---|
| / / | / / |

------ REMOVE DOCUMENT ALONG THIS PERFORATION ------

| Claim Number | Location |
|---|---|
| 00B02052585 | 12A |

Social Security No./Tax I.D. No.

RE: FAAS, MICHAEL

**TIG INSURANCE**
TIG INSURANCE COMPANY

| | Check Number |
|---|---|
| 92-20 / 311 | 612867504 |
| Date | 10/02/02 |
| Amount | **$90,731.14 |

Void after six months

PAY    Ninety thousand seven hundred thirty one and 14/100 Dollars

To the
order of
NEW JERSEY TURNPIKE AUTHORITY
ATTN JOHN WALKER/RE MICHAEL FAAS
C/O PMA
100 CENTURY PKWY
MT LAUREL NJ 080546007

CITIBANK DELAWARE - A SUBSIDIARY OF CITICORP
ONE PENN'S WAY
NEW CASTLE, DE 19720

⑈612867504⑈ ⑆031100209⑉ 38539845⑈

00118

# TIG INSURANCE COMPANY

| Check Number | Date of Check | Reference Number |
|---|---|---|
| 612867503 | 10/02/02 | 6111002220038 |

| Policy Number | Claim Number | Region - Agent |
|---|---|---|
| 00141626 | 00B02052585 | 96-010 |

| Name of Insured | Location |
|---|---|
| NEW JERSEY TURN | 12A |

| Employee/Claimant Name | Claims Office |
|---|---|
| FAAS, MICHAEL | TRANSP. UNIT #1 |

| Date of Loss | Check Amount | Office Telephone Number |
|---|---|---|
| 09/25/92 | $8,889.44 | 800-448-8417 |

### Payee Name
NEW JERSEY TURNPIKE AUTHORITY, ATTN JOHN WALKER/RE MICHAEL FAAS

### Payee Address
C/O PMA 100 CENTURY PKWY MT LAUREL NJ 080545007

### In Payment of
PRORATA EXPENSE REIMB. EXCESS SIR

| From Date | Through Date |
|---|---|
| / / | / / |

— REMOVE DOCUMENT ALONG THIS PERFORATION —

| Claim Number | Location | | | | Check Number |
|---|---|---|---|---|---|
| 00B02052585 | 12A | | 82-80 | | 612867503 |
| | | | 311 | | |

Social Security No./Tax I.D. No.

RE: FAAS, MICHAEL

**TIG INSURANCE**℠

TIG INSURANCE COMPANY

Date 10/02/02

Amount
***$8,889.44

Void after six months

PAY   Eight thousand eight hundred eighty nine and 44/100 Dollars

To the
order of
NEW JERSEY TURNPIKE AUTHORITY
ATTN JOHN WALKER/RE MICHAEL FAAS
C/O PMA
100 CENTURY PKWY
MT LAUREL NJ 080545007

CITIBANK DELAWARE — A SUBSIDIARY OF CITICORP
ONE PENN'S WAY
NEW CASTLE, DE 19720

⑈612867503⑈ ⑆031100209⑆ 38539845⑈

EXHIBIT 9

November 22, 2002

Wexford Underwriting Managers, Inc.
40 Fulton Street
23rd Floor
New York, NY 10038-3714
  Attn: Joseph J. Griswold, Jr.
        Regional Claims Manager

Re: Insured/Client: New Jersey Turnpike Authority
    Injured Worker/Petitioner: Michael Faas
    Date of Loss: 9/25/92
    Our Claim No: W2592-47003
    Policy No: W-141626A

Dear Mr. Griswold:

Please accept this letter as a status report on the above captioned New Jersey Workers'
Compensation matter.

DESCRIPTION OF ACCIDENT:

This injured worker/petitioner was working as a toll collector on the above date of
accident, when there was a chemical spill in the toll lanes. A total of four employees were
taken to the hospital but Mr. Faas was the only employee who did not return to work
immediately. After reviewing the petitioner's medical records the claim was denied, as it
was found the petitioner had a pre-existing pulmonary condition, which was documented
on 10/20/89 by Dr. Sherbin, the Turnpike Authority's Medical Director during that time.

CLAIM SUMMARY:

The petitioner filed a claim petition alleging permanent pulmonary disability due to the
chemical spill. The case proceeded to trial and on June 12, 1998 Judge Marinari awarded
the petitioner 100% of total permanent disability or 450 weeks at $409.00 per week, for a
total award of $184,000. Since the petitioner had received a third party award through an
uninsured motorist claim, in the amount of $250,000, the Turnpike Authority would have
been responsible for one-third of the award, or $61,350. This sum would have been
payable to the petitioner at the rate of $136.33 per week, or 450 weeks from the date the
petitioner became totally disabled on April 1, 1993 and thereafter, as a result of the Social
Security reduction of $370.34 per week until approximately February 8, 2014, and

Page 2

thereafter, at the rate of $409 per week until the petitioner dies. The judge also assessed costs of medical and counsel fees totally against the Turnpike Authority with no contribution from the petitioner. The judge also refused to assess any disability against the Second Injury Fund despite the fact that he had earlier convinced them to accept 10% of the disability. If the Second Injury Fund had been brought into the case as expected, it would have certainly limited the amount of the Turnpike Authority's contribution in this matter.

Following this decision by the judge, an appeal was filed.  During the appeal process, the New Jersey Turnpike Authority Commissioners authorized payment in full of the permanent disability awarded less the Section 40 credit as a result of the 3rd party case. The petitioner would have been entitled to this payment regardless of the outcome of the appeal. The payment was for the original 450 weeks and covered the period 4/1/93-11/16/01.

The Appellate Division eventually upheld the decision of Judge Marinari and indicated that the medical testimony supported a finding of 100% total disability based upon the pulmonary condition of the petitioner. In applying case law, the Appellate Division found that from the testimony adduced at trial, there was simply not sufficient evidence that the pre-existing disability the petitioner did have affected his ability to work or his personal lifestyle.

Since the petitioner had been paid up to 11/16/01, there were to be no further payments made to him until the first 4 week period following 11/16/01. Those payments have now begun, and we are paying the petitioner $136.33 per week for 161 2/7 weeks or 11/16/01-12/19/04. The petitioner is currently receiving $545.32 per month. Starting on 12/20/04, we will begin paying the petitioner at the social security offset rate of $370.34 per week. We will continue to pay benefits at this offset rate until the petitioner reaches the age of 62 on 2/8/14. Thereafter, payments will be made to the petitioner at the full total rate of $409 per week for the rest of his life.

MEDICAL:

As you are aware, along with this award the Turnpike Authority is also responsible for future medical treatment required by the petitioner, for pulmonary related illnesses. The petitioner is basically stable at the moment as far as his pulmonary injury is concerned. However, the petitioner did recently contact our office and report that he has been having a problem with his throat. As a result, his doctor wanted to refer him to a throat doctor for an evaluation. I spoke with our nurse/case manager about this and she indicated that the petitioner needs to be very careful with anything remotely respiratory. If he were to get a throat infection it could lead to a pulmonary problem, so she felt he should definitely be seen by a throat doctor. As a result, we have authorized the examination.

Page 3

We have continued to receive medical bills from providers for various injuries/illnesses, some of which we do not feel are related to his pulmonary condition. As a result, we continue to review and deny when necessary. As you are aware, with a subjective injury such as this, the medical providers attempt to claim that almost everything is related to his pulmonary problems.

RESERVES:

|  | Incurred | Paid | Outstanding |
|---|---|---|---|
| Medical | $300,000 | $256,333.09 | $43,666.00 |
| Indemnity | $259,832 | $89,389.16 | $170,442.84 |
| Expenses | $35,000 | $33,383.36 | $1,616.00 |
| Totals | $594,832 | $379,105.61 | $215,724.84 |

    $345,722.25 – Indemnity & Medical paid
-  $250,000.00 – Self Insured Retention (SIR)
=   $95,722.25
-   $90,731.14 – Total reimbursement to date
=    $4,991.11 – Reimbursement owed

REMARKS:

We will now place this file on a 90 day reporting diary and provide a status report to your office at that time. In the meantime, please feel free to contact the undersigned with any questions or comments regarding the above.

Very truly yours,

John Walker
Account Claims Rep
856-727-3055

enc.

EXHIBIT 10

May 30, 2003

Wexford Underwriting Managers, Inc.
40 Fulton Street
23rd Floor
New York, NY 10038-3714
  Attn: Joseph J. Griswold, Jr.
        Regional Claims Manager

Re: Insured/Client: New Jersey Turnpike Authority
     Injured Worker/Petitioner: Michael Faas
     Date of Loss: 9/25/92
     Our Claim No: W2592-47003
     Policy No: W-141626A

Dear Mr. Griswold:

With regard to the above matter, this will confirm that we have discussed this matter and decided that we would schedule Michael Faas for an Independent Medical Examination with a pulmonary specialist. The purpose of the IME is to get a medical status on his current condition, and also to obtain an outlook on his future with regard to ongoing medical treatment, etc.

Please be advised that we had scheduled a tentative appointment with a Dr. Duberstein. However, the undersigned cancelled the same, as Dr. Duberstein is more of a permanency doctor then an IME doctor. In this particular instance, we are not looking for a permanency rating, as the workers' compensation courts have already found Mr. Faas totally and permanently disabled.

At this time, we are going to speak with the Turnpike Authority's Medical Director, Dr. Mellendick, in order to obtain his recommendation on a pulmonary physician, who can provide us with the type of evaluation and opinion we are looking for. Once we have scheduled the examination, we will advise your office of the date and time. Upon our receipt of the physician's medical report, we will then have Rhonda Zuckerman prepare an updated catastrophic case/reserve report with estimated lifetime reserve for medical treatment.

We would like to take this opportunity to thank you for your cooperation and would ask that you please contact the undersigned with any questions or comments concerning this matter.

Page 2

Very truly yours,


John Walker
Account Claims Rep
856-727-3055

EXHIBIT 11

C.O. O

154

January 7, 2004


Wexford Underwriting Managers, Inc.
40 Fulton Street
23rd Floor
New York, NY 10038-3714
  Attn: Joseph J. Griswold, Jr.
        Regional Claims Manager

Re: Insured/Client: New Jersey Turnpike Authority
      Injured Worker/Petitioner: Michael Faas
      Date of Loss: 9/25/92
      Our Claim No: W2592-47003
      Policy No: W-141626A

Dear Mr. Griswold:

With regard to the above matter, enclosed please find a copy of the Independent Pulmonary Medical Evaluation report from Dr. Henry Velez, of Occupational Medical Associates. Although the report is dated October 6, 2003, the same day of the evaluation, it was not completed and submitted until December 2003. This was done by design as Dr. Velez wanted us to review the same before his final submission. This appears to be an excellent report which we will use as a valuable reference tool for the life of this very complicated claim.

As you can see from the enclosed, Dr. Velez has outlined what he feels are the work related vs. non-work related illnesses, along with the work related vs. non-work related medications. This should certainly help us with regard to future evaluations of submitted medical bills. Perhaps we could continue to use Dr. Velez, as needed, in order to review those bills for future treatment which is considered questionable. As you are certainly aware, the bills/reports in this matter can be very overwhelming to review.

At this time, we are going to ask our Nurse Case Manager, Rhonda Zuckerman, to review this report and update the Life Care Plan that she previously submitted.

We would like to take this opportunity to thank you for your cooperation and would ask that you please contact the undersigned with any questions or comments concerning this matter.

Page 2

Very truly yours,


John Walker
Account Claims Rep
856-727-3055

enc.

*Occupational Medical Associates, Inc.*

HENRY VELEZ, MD, FCCP

P.O. BOX 660
FAIR LAWN, NEW JERSEY 07410
TEL 201-794-8085
FAX 201-794-8086

October 6, 2003

John Walker
Account Claims Representative
The PMA Insurance Group
P.O. Box 25249
Lehigh Valley, PA 18002-5249

Re: Michael Faas
Date of Loss: 9/25/92
Your Claim No.: W2592-47003

Dear Mr. Walker:

At your request, on October 6, 2003, Mr. Michael Faas presented to this office for a Disability/Independent Medical Evaluation. In addition, prior to his visit, I received and subsequently reviewed extensive records as they pertained to the bulk of his illnesses leading to his present state of disability.

**Present Medical Complaints:**

When asked, Mr. Faas stated that he has limited use of his left hand, that he suffers from bilateral foot pain, and that he experienced shortness of breath after ascending one half flight of stairs. Additional respiratory symptomatology given was an episodic dry cough, episodic wheezing from his chest and episodic chest pain. When seen, Mr. Faas volunteered that he had recently undergone a cardiac evaluation which included a cardiac stress test and a multiple gated acquisition study which were reported to him as being normal. In addition, he had subsequent appointments scheduled for follow up for continued cardiac evaluation as necessary.

**Past Medical History:**

Those medical conditions, which in my opinion are work related, are proceeded with an asterisk.

Allergic rhinitis.
Appendectomy.
Benign prostatic hypertrophy.

Chronic obstructive pulmonary disease. *
Deep venous thrombosis, which required a Greenfield Filter. *
Depression, chronic. *
Gastroesophageal reflux disease. *
Herniated disc x 2.
Hypercholesterolemia.
Hypertension.
Osteoporosis. *

## Family History:

Of significance is that his father succumbed to emphysema.

## Occupational History:

Mr. Faas worked as a toll collector and carpenter for the New Jersey Turnpike Authority. His last day worked was September 9, 1992. At that point, he and several other co-workers were briefly exposed to a spill of an unknown chemical compound. Of all those exposed, Mr. Faas was the only one who experienced any respiratory symptomatology. Of importance, is that prior to that incident, pulmonary function testing showed a pre-existing moderate degree of ventilatory insufficiency.

## Social History:

Mr. Faas started smoking cigarettes at age 14. He smoked about one pack per day. He discontinued their use at age 32.

## Allergies:

None known.

## Medications:

Those medications, which in my opinion are required for treatment of his work-related illnesses, and work related complications, are proceeded with an asterisk.

Advair 500/50, bid. *
Albuterol, MDI, two puffs, prn. *
Ambien, 10mg, qhs. *
Clarinex, 5mg, qd.
Coumadin, 5mg alternating with 7.5mg. *
Cyclobenzaprine, 10mg, tid. *
Diltiazem, 180mg, qd.
Diovan, 80mg, qd.
Ferrex 150 Forte, qd. *

Flomax 0.4mg qd.
Fosomax 70mg, once per week.
Hydrocodone/MDM Syrup, pm.
Ipratropium via nebulizer, q4h, pm.
Nasonex, two squirts, qd.
Prednisone, 5mg, qd.
Prevacid 15mg, qd.
Pulmicort respules via nebulizer, bid.
Ryatan bid.
Zetia, 10mg qd.
Zoloft 150mg, qd.

**Review of Systems:**

Presently under the care of Dr. Robin Lucas, a Pulmonologist, whom he visits on a monthly basis. Mr. Faas further stated that from 1992 until 1999 he was hospitalized about three times per year for respiratory symptomatology. He further stated that on the date of exposure, he was exposed to an unknown compound for approximately 45 minutes in an outdoor environment. The compound had the smell of manure. He experienced a sore throat, light headedness and for the next five days experienced dyspnea on exertion. On December 9, 1999, Mr. Faas was admitted to St. Peter's Hospital in New Brunswick, New Jersey. He was experiencing respiratory distress. While in the hospital, he developed several malignant arrhythmias. Over a short period of time, he suffered five cardio-pulmonary arrests. He was successfully resuscitated. However, he remained in a coma for approximately three months. His total hospitalization at that time for that incident was approximately five months. Thereafter, he was transferred to Kessler Institute for Rehabilitation where he was treated for approximately nine months.

**Review of Records:**

Kessler Institute for Rehabilitation [KIR]

This is listed as Mr. Faas's second to admission to KIR beginning on April 20, 2000 with a discharge of June 1, 2000.

The December 1999 admission to St. Peter's University Hospital is reviewed. The records states that Mr. Faas was admitted for an exacerbation of chronic obstructive pulmonary disease which required intubation. He developed multiple arrhythmias. He developed a methicillin resistant staff aureus infection and acute respiratory distress syndrome. The multiple resuscitations are noted. Also noted was the development of an ileus and an upper gastrointestinal bleed. Due to his prolonged period of coma within the intensive care unit and due to the use of steroids, Mr. Faas developed ICU polyneuropathy and myopathy.

Due to his prolonged period of inactivity, Mr. Faas developed bilateral deep venous thrombosis, which ultimately required the placement of a Greenfield Filter in the inferior vena cava. He was also started on chronic anti-coagulation treatment which consists of coumadin.

That hospitalization also required peritoneal dialysis due to acute tubular necrosis. Subsequently, his renal function returned to normal. Also due to his prolonged period of inactivity, he developed an extensive sacral decubitus which ultimately required surgical debridement. Finally, due to his multiple medical problems, depression was diagnosed and Zoloft was prescribed. After extensive physical therapy, throughout this admission, Mr. Faas was discharged, however, back to Robert Wood Johnson Hospital for intractable vomiting. The discharge record notes that at the time of his transfer, Mr. Faas was continent, however, had a permanent foot drop. A chest x-ray was performed showing clear lung fields.

Kessler Institute for Rehabilitation

The record lists the admission of June 15, 2000 as Mr. Faas's third admission to KIR. He was discharged on August 30, 2000. The record lists gastroparesis as the reason for Mr. Faas's intractable vomiting. While at St. Peter's he also developed acute bronchitis with respiratory symptomatology. Also noted was that his depression worsened and required higher doses of Zoloft. Throughout this admission to KIR, Mr. Faas underwent extensive treatment of his sacral decubitus ulcer. In addition, Neurontin was prescribed for pain. A repeat chest x-ray showed clear lung fields with a healed fracture of the left 6th, 7th and 8th ribs. Now noted was a possible left lower lobe chronic infiltrate. While at KIR, a neuro-psychiatric evaluation was performed. It was found that Mr. Faas had a IQ of 84 which is considered within the average range. However, evaluation revealed short and long term memory deficits. He was noted to be mildly depressed at that time.

Kessler Institute for Rehabilitation

This is listed as Mr. Faas's fourth admission to KIR beginning on September 14, 2000 with a discharge date of October 12, 2000. He was received from St. Peter's Hospital where he had been transferred to on August 30, 2000. His transfer was due to an acute change in his mental status with confusion. Initial evaluation revealed a markedly elevated calcium level with evidence of loss of renal function. His level of anti-coagulation as evidenced by an INR of 6.54 was also markedly elevated showing over anti-coagulation. While at St. Peter's he was treated for delirium. He also developed a pleural effusion and underwent a diagnostic tap which was normal. At that point, his sacral decubitus had advanced to a Grade III.

An electrocardiogram revealed a right bundle branch block and first degree heart block. A repeat chest x-ray continued to show a chronic left lower lobe infiltrate. Again, his renal function returned to normal as did his calcium level, however, he was found to be slightly anemic.

Kessler Institute for Rehabilitation

Orthopedic evaluations with outpatient physical therapy coupled with a home exercise program began on January 15, 2001. Initially, at 15 sessions he was noted to be ambulatory and to be cooperating and performing well a home exercise program. On February 19, 2001 he had completed 31 sessions and again was progressing. On April 9, 2001 he had completed 40 sessions and was noted to be completely independent in his home exercise program and was able to carry a five pound load for short distances.

St. Peter's University Hospital, New Brunswick, New Jersey.

His admission of December 1999 was not supplied, however, the supplied records made considerable mention of the events of that hospitalization. In essence, Mr. Faas was admitted in respiratory distress due to multiple malignant arrhythmias. He underwent five cardiopulmonary arrests from which he was successfully resuscitated. As stated above, he has in a coma for three months. His hospitalization was quite prolonged causing him to suffer numerous complications. However, a notation is made that his baseline cognitive function upon discharge was intact.

St. Peter's University Hospital, New Brunswick, New Jersey.

Mr. Faas's admission of April 5-April 20, 2000 is reviewed. The discharge diagnoses were atrial fibrillation, chronic obstructive pulmonary disease, diabetes mellitus, deep venous thrombosis, hypertension, and polyneuropathy secondary to a critical illness, sacral decubitus and severe induced myopathy.

Mr. Faas's subsequent admission to St Peter's University Hospital was not provided, however, were clearly outlined in the KIR records.

New Jersey Turnpike Authority

Spirometry was performed on October 20, 1989. The forced vital capacity was 64% of predicted, the FEV1 was 40% of predicted and the ratio of the two was 63% of predicted. This clearly shows a moderate to severe ventilatory defect which pre-existed his date of incident which was September 25, 1992.

**Assessment:**

Based on review of all of the above, and based on my interview with Mr. Faas of October 6, 2003, the following are my considered medical opinions. In addition, I will list those illnesses and disabilities, which Mr. Faas suffers, which I feel are legally considered to be causally related to his incident. I will provide the diagnosis with the appropriate ICD code. In addition, I will attempt to outline what will be his minimal medical needs for the rest of his life. I will supply CPT codes which can be used by you to determine the usual and customary charges for his ongoing medical expenses. Finally, those illnesses which I feel are not related to his permanent disability will also be listed, again, using ICD codes. However, CPT codes for ongoing service will not be listed, as they would be charges by medical providers which are not related to his ongoing work related permanent disability.

**Work Related Illnesses:**

The following medical conditions and their associated ICD Codes [International Classification of Diseases, ICD-9-CM, 6th Ed., 2003] were found to be either complications and/or the result of his initial work related illness.

Mr. Faas's initial presentation was chronic obstructive pulmonary disease [ICD-9, 491.20] that was punctuated by exacerbations of chronic obstructive pulmonary disease [ICD-9, 491.21].

Mr. Faas's present medical state began on December 1999 when he was admitted to St. Peter's University Hospital, for an exacerbation of chronic obstructive pulmonary disease. While in the hospital, his respiratory condition worsened to the point where he required intubation and mechanical ventilation. While being treated for his critical illness, Mr. Faas developed multiple arrhythmias and suffered about five cardio-pulmonary arrests. He was successfully resuscitated from all of his life threatening events; however, Mr. Faas went into a comatose state where he remained for about three months.

As a result of his prolonged state of coma, Mr. Faas developed the following medical conditions.

Deep Venous Thrombosis, [ICD-9, 453.8] which required a Greenfield Filter which was placed in the inferior vena cava. Two complications of Deep Venous Thrombosis, one being pulmonary embolus and the second being post phlebitis syndrome did not and have not occurred to date. However, Mr. Faas will require the use of Coumadin [Warfarin, generic] on a daily basis with monitoring of the prothrombin time [CPT 85610] on a six to eight week basis for the remainder of his natural life.

As a result of his prolonged state of coma, Mr. Faas developed bilateral peripheral neuropathy of the lower extremities, [ICD-9, 355.8 NEC] and a flexion contracture of the left hand [ICD-9, 718.44]. Both of these conditions are permanent in nature and do not require any further treatment at this time. It is conceivable, that the bilateral peripheral neuropathy may symptomatically worsen to the point where medications such as Neurontin may need to be prescribed for the control of symptoms to pain. However, to this date, it does not appear to be necessary. As a result of his treatment, specifically, the use of steroids, for the control of his chronic obstructive pulmonary disease, Mr. Faas has developed osteoporosis [ICD-9, 733.00]. Presently he is being treated with Fosomax 70 mg orally, once per week. It is anticipated that he will remain on this medication for the remainder of his natural life. In addition, current guidelines recommend that a DEXA scan, [bone mineral density, CPT 76075] be performed once every two years to evaluate the stability and/or progression of his established bone loss. It could also be argued, that as a consequence of chronic corticosteroid use, Mr. Faas developed gastroesophageal reflux disease, [ICD-9, 530.11]. At this time, he is being successfully treated with Prevacid 15 mg orally once per day. It is anticipated that he will remain on this medication or perhaps at an increased dose to a maximum of 30 mg per day for the remainder of his natural life.

Emotionally, and as a result of his chronic illness, Mr. Faas has developed a prolonged reactive depression [ICD-9, 309.1] which is now chronic. Presently he is taking Zoloft 150 mg orally daily. It is reasonable to expect that he will continue this medication and/or another similar medication for the remainder of his natural life. He may need routine office monitoring by a mental health care specialist about two to four times per year.

The greatest risk, which Mr. Faas faces at this time, is for a repeat exacerbation of chronic obstructive pulmonary disease. Under the care of Dr. Robin Lucas, a pulmonologist, Mr. Faas is doing well. As a minimum, Mr. Faas should see Dr. Lucas once per year for a complete physical examination [CPT 99205]. He should receive a yearly chest x-ray, two views [CPT 71020]; a standard 12 lead electrocardiogram [CPT 93000], and spirometry, pre and post a bronchodilator [CPT 94060] with an associated inhalation treatment [CPT 94640]. Most pulmonary specialists will perform pulse oximetry [CPT 94760] at the time of the initial visit and for follow up office visits.

Additionally, on a yearly basis, it would be expected that Mr. Faas undergo routine laboratory testing to include a comprehensive metabolic panel [CPT 80053], a complete blood count [CPT 85025], and a complete urinalysis [CPT 81001]. Treatment strategies would include vaccination for influenza, [CPT 90658] once per year and vaccination for pneumococcus pneumonia [CPT 90732] once every five years.

Depending on the doctor's treatment protocol, Mr. Faas should be seen in the office [CPT 99214] every four to eight weeks for routine monitoring of his chronic medical conditions. Additional testing at that time should be minimal, however, would be determined by any new complaints, which Mr. Faas may give. If hospitalization for an exacerbation of chronic obstructive pulmonary disease occurs, then charges and their appropriateness to his work related disease will have to be reviewed on a case by case basis.

With respect to his medications for his respiratory problems, I would anticipate the following. He will continue to demonstrate an indefinite medical need for Advair 500/50, twice per day, Albuterol, MDI two puffs as needed, Hydrocodone/MDM cough syrup on a as needed basis, Ipratropium via nebulizer, as needed, Prednisone 5 mg daily, and Pulmicort respules via nebulizer twice per day.

## Non Work Related Illnesses:

Mr. Faas suffers from several medical conditions, which are not related to his initial and ongoing respiratory illness with its documented complications.

He suffers from allergic rhinitis [ICD-9, 477.9 and uses Rystan on a twice-daily basis. Mr. Faas's history of appendectomy due to acute appendicitis [ICD-9, 540.9] was a self-limited acute inflammatory process and does not require any further care. He also suffers from benign prostatic hypertrophy [ICD-9, 600.0] for which he will take Flomax on a daily basis for an indefinite period. The given history of two herniated lumbar intervertebral discs [ICD-9, 722.10] is not symptomatic at this time. However, should he present with low back pain and progressive neurological dysfunction of the lower extremities, then, surgery would need to be considered. Although, clearly not work related, his underlying and pre-existing lung disease would increase his risk from anesthetic and surgical complications. Accordingly, should this scenario occur, then, medical charges would have to be reviewed on a case by case basis. The given history also states hypercholesterolemia [ICD-9, 272.0] for which he takes Zetia daily. It is anticipated that he will need to take this medication indefinitely. Mr. Faas also suffers from benign hypertension [ICD-9, 401.1]. In view of normal kidney function, this medical condition would be not considered causally related to his work related medical conditions. For his hypertension, Mr. Faas takes on a daily basis Diltiazem and Diovan. He will need to take these medications for an indefinite basis.

Presently, by the history given, Mr. Faas is undergoing a cardiac evaluation. The details are stated under present medical complaints. It is my considered medical opinion, that his cardiac evaluation is not casually related to his work related medical conditions.

**Clinical Summary:**

In summary, Mr. Faas suffered from an exacerbation of chronic obstructive pulmonary disease, which ultimately led to respiratory insufficiency requiring cardiopulmonary resuscitative measures. As a result of his prolonged comatose state, he also suffered numerous medical and neurological complications, which are listed above.

In addition to his obvious work related illnesses and known complications, Mr. Faas also suffers from several non-work related diseases. At this time, Mr. Faas is doing well and only requires routine ongoing medical treatment. However, he is at risk for worsening of his underlying lung disease. Should ventilatory insufficiency occur again, then hospitalization may be necessary. At that point, I would recommend that the file be reviewed as to determine what would be appropriate related charges to his work related illnesses.

Additionally, Mr. Faas like all other individuals has developed and suffers from various non-work related medical conditions. The most obvious are hypercholesterolemia and hypertension. Both of these entities are known to increase the risk for coronary heart disease. Therefore, should any substantial illnesses occur, then, competing causes for morbidity [illness] and mortality [death] such as heart disease would have to be considered as to their work relatedness.

Thank you for the courtesy of this very interesting case. I trust that my comments will be of help to you. Should any questions arise, please do not hesitate to contact me at your earliest convenience.

Sincerely,

Henry Velez, M.D., FCCP
Diplomate, American Boards of Internal and Pulmonary Medicine

Enclosure: Curriculum Vitae

EXHIBIT 12

C.O.O

January 23, 2004

Wexford Underwriting Managers, Inc.
40 Fulton Street
23rd Floor
New York, NY 10038-3714
  Attn: Joseph J. Griswold, Jr.
        Regional Claims Manager

Re: Insured/Client: New Jersey Turnpike Authority
    Injured Worker/Petitioner: Michael Faas
    Date of Loss: 9/25/92
    Our Claim No: W2592-47003
    Policy No: W-141626A

Dear Mr. Griswold:

Please accept this letter as a status report on the above captioned New Jersey Workers' Compensation matter.

DESCRIPTION OF ACCIDENT:

This injured worker/petitioner was working as a toll collector on the above date of accident, when there was a chemical spill in the toll lanes. A total of four employees were taken to the hospital but Mr. Faas was the only employee who did not return to work immediately. After reviewing the petitioner's medical records the claim was denied, as it was found the petitioner had a pre-existing pulmonary condition, which was documented on 10/20/89 by Dr. Sherbin, the Turnpike Authority's Medical Director during that time.

CLAIM SUMMARY:

The petitioner filed a claim petition alleging permanent pulmonary disability due to the chemical spill. The case proceeded to trial and on June 12, 1998 Judge Marinari awarded the petitioner 100% of total permanent disability or 450 weeks at $409.00 per week, for a total award of $184,000. Since the petitioner had received a third party award through an uninsured motorist claim, in the amount of $250,000, the Turnpike Authority would have been responsible for one-third of the award, or $61,350. This sum would have been payable to the petitioner at the rate of $136.33 per week, or 450 weeks from the date the petitioner became totally disabled on April 1, 1993 and thereafter, as a result of the Social Security reduction of $370.34 per week until approximately February 8, 2014, and

Page 2

thereafter, at the rate of $409 per week until the petitioner dies. The judge also assessed costs of medical and counsel fees totally against the Turnpike Authority with no contribution from the petitioner. The judge also refused to assess any disability against the Second Injury Fund despite the fact that he had earlier convinced them to accept 10% of the disability. If the Second Injury Fund had been brought into the case as expected, it would have certainly limited the amount of the Turnpike Authority's contribution in this matter.

Following this decision by the judge, an appeal was filed.  During the appeal process, the New Jersey Turnpike Authority Commissioners authorized payment in full of the permanent disability awarded less the Section 40 credit as a result of the 3rd party case. The petitioner would have been entitled to this payment regardless of the outcome of the appeal. The payment was for the original 450 weeks and covered the period 4/1/93-11/16/01.

The Appellate Division eventually upheld the decision of Judge Marinari and indicated that the medical testimony supported a finding of 100% total disability based upon the pulmonary condition of the petitioner. In applying case law, the Appellate Division found that from the testimony adduced at trial, there was simply not sufficient evidence that the pre-existing disability the petitioner did have affected his ability to work or his personal lifestyle.

Since the petitioner had been paid up to 11/16/01, there were to be no further payments made to him until the first 4 week period following 11/16/01. Those payments have now begun, and we are paying the petitioner $136.33 per week for 161 2/7 weeks or 11/16/01-12/19/04. The petitioner is currently receiving $545.32 per month. Starting on 12/20/04, we will begin paying the petitioner at the social security offset rate of $370.34 per week. We will continue to pay benefits at this offset rate until the petitioner reaches the age of 62 on 2/8/14. Thereafter, payments will be made to the petitioner at the full total rate of $409 per week for the rest of his life.

MEDICAL:

As you are aware, along with this award the Turnpike Authority is also responsible for future medical treatment required by the petitioner, for pulmonary related illnesses. The petitioner has basically been stable at this time and has only required routine ongoing medical treatment.

At your request, an Independent Medical Examination (IME) was arranged with Dr. Henry Velez, of Occupational Medical Associates, whose report we have previously forwarded to your attention. We feel this is an excellent report that will help us in our future evaluation and handling of this very difficult and complicated claim.

Page 3

With your permission, we would like to suggest forwarding a copy of this report to Mr.
Faas, so that he is aware of which treatment we will be authorizing going forward, as part
of his workers' compensation claim. Dr. Velez was also kind enough to outline those
medications which he felt were related to the work injury, and those which were not. We
will await your advice in this regard.

RESERVES:

|  | Incurred | Paid | Outstanding |
|---|---|---|---|
| Medical | $300,000 | $275,541.32 | $24,458.00 |
| Indemnity | $259,832 | $97,568.96 | $162,263.00 |
| Expenses | $35,000 | $33,482.18 | $1,517.00 |
| Totals | $594,832 | $406,592.46 | $188,238.00 |

  $373,110.28 – Indemnity & Medical paid
- $250,000.00 – Self Insured Retention (SIR)
= $123,110.28
-  $90,731.14 – Total reimbursement to date
= $32,379.14 – Reimbursement owed

We have received a total of $8,889.44 for Pro Rata Expenses.

REMARKS:

We will now place this file on a 90 day reporting diary and provide a status report to your
office at that time. In the meantime, please feel free to contact the undersigned with any
questions or comments regarding the above.


Very truly yours,



John Walker
Account Claims Rep
856-727-3055

enc.

# EXHIBIT 13



Bob_A_LaPorte@wexfo    To: John_Walker@pmagroup.com
rdgroup.com            cc:
                       Subject: Michael Fass
01/27/2004 09:53 AM

177

John,

I am in receipt of your payment request. Please send me the payment
history.

Thanks,

Bob

C.O.O

176

February 17, 2004


Wexford Underwriting Managers, Inc.
40 Fulton Street
23rd Floor
New York, NY 10038-3714
 Attn: Bob LaPorta

Re: Insured/Client: New Jersey Turnpike Authority
     Injured Worker: Michael Faas
     Date of Loss: 9/25/92
     Our Claim No: W2592-47003
     Policy No: W-141626A

Dear Mr. LaPorta:

As a supplement to our report of January 23, 2004, and per your request, enclosed please
find a copy of our payment history in the above matter.

Please feel free to contact the undersigned with any questions concerning this matter.


Very truly yours,


John Walker
Account Claims Rep
856-727-3055

enc.

EXHIBIT 14

C. O. O

April 16, 2004

Wexford Underwriting Managers, Inc.
40 Fulton Street
23rd Floor
New York, NY 10038-3714
 Attn: Joseph J. Griswold, Jr.
          Regional Claims Manager

Re: Insured/Client: New Jersey Turnpike Authority
       Injured Worker/Petitioner: Michael Faas
       Date of Loss: 9/25/92
       Our Claim No: W2592-47003
       Policy No: W-141626A

Dear Mr. Griswold:

Please accept this letter as a status report on the above captioned New Jersey Workers'
Compensation matter.

DESCRIPTION OF ACCIDENT:

This injured worker/petitioner was working as a toll collector on the above date of
accident, when there was a chemical spill in the toll lanes. A total of four employees were
taken to the hospital but Mr. Faas was the only employee who did not return to work
immediately. After reviewing the petitioner's medical records the claim was denied, as it
was found the petitioner had a pre-existing pulmonary condition, which was documented
on 10/20/89 by Dr. Sherbin, the Turnpike Authority's Medical Director during that time.

CLAIM SUMMARY:

The petitioner filed a claim petition alleging permanent pulmonary disability due to the
chemical spill. The case proceeded to trial and on June 12, 1998 Judge Marinari awarded
the petitioner 100% of total permanent disability or 450 weeks at $409.00 per week, for a
total award of $184,000. Since the petitioner had received a third party award through an
uninsured motorist claim, in the amount of $250,000, the Turnpike Authority would have
been responsible for one-third of the award, or $61,350. This sum would have been
payable to the petitioner at the rate of $136.33 per week, or 450 weeks from the date the

Page 2

petitioner became totally disabled on April 1, 1993 and thereafter, as a result of the Social Security reduction of $370.34 per week until approximately February 8, 2014, and thereafter, at the rate of $409 per week until the petitioner dies. The judge also assessed costs of medical and counsel fees totally against the Turnpike Authority with no contribution from the petitioner. The judge also refused to assess any disability against the Second Injury Fund despite the fact that he had earlier convinced them to accept 10% of the disability. If the Second Injury Fund had been brought into the case as expected, it would have certainly limited the amount of the Turnpike Authority's contribution in this matter.

Following this decision by the judge, an appeal was filed.  During the appeal process, the New Jersey Turnpike Authority Commissioners authorized payment in full of the permanent disability awarded less the Section 40 credit as a result of the 3rd party case. The petitioner would have been entitled to this payment regardless of the outcome of the appeal. The payment was for the original 450 weeks and covered the period 4/1/93-11/16/01.

The Appellate Division eventually upheld the decision of Judge Marinari and indicated that the medical testimony supported a finding of 100% total disability based upon the pulmonary condition of the petitioner. In applying case law, the Appellate Division found that from the testimony adduced at trial, there was simply not sufficient evidence that the pre-existing disability the petitioner did have affected his ability to work or his personal lifestyle.

Since the petitioner had been paid up to 11/16/01, there were to be no further payments made to him until the first 4 week period following 11/16/01. Those payments have now begun, and we are paying the petitioner $136.33 per week for 161 2/7 weeks or 11/16/01-12/19/04. The petitioner is currently receiving $545.32 per month. Starting on 12/20/04, we will begin paying the petitioner at the social security offset rate of $370.34 per week. We will continue to pay benefits at this offset rate until the petitioner reaches the age of 62 on 2/8/14. Thereafter, payments will be made to the petitioner at the full total rate of $409 per week for the rest of his life.

MEDICAL:

As you are aware, along with this award the Turnpike Authority is also responsible for future medical treatment required by the petitioner, for pulmonary related illnesses. The petitioner has basically been stable at this time and has only required routine ongoing medical treatment.

At your request, an Independent Medical Examination (IME) was arranged with Dr. Henry Velez, of Occupational Medical Associates, whose report we have previously

Page 3

forwarded to your attention. We feel this is an excellent report that will help us in our future evaluation and handling of this very difficult and complicated claim.

We have forwarded a copy of this report to Mr. Faas, so that he is aware of what treatment will be authorized going forward, as part of his workers' compensation claim. Dr. Velez was also kind enough to outline those medications which he felt were related to the work injury, and those which were not.

RESERVES:

| | Incurred | Paid | Outstanding |
|---|---|---|---|
| Medical | $300,000 | $281,107.75 | $18,892.00 |
| Indemnity | $259,832 | $99,204.92 | $160,627.00 |
| Expenses | $35,000 | $33,482.18 | $1,517.00 |
| Totals | $594,832 | $413,794.85 | $181,036.00 |

Along with this report, we are enclosing a copy of the updated catastrophic case/reserve report, prepared by our Nurse/Case Manager, Rhonda Zuckerman. As you can see, the new medical incurred figure is $490,094. As a result, we would request your authority to increase the medical incurred reserve to this amount.

```
  $380,312.67 – Indemnity & Medical paid
- $250,000.00 – Self Insured Retention (SIR)
= $130,312.67
- $90,731.14 – Total reimbursement to date
= $39,581.53 – Reimbursement owed
```

We have received a total of $8,889.44 for Pro Rata Expenses.

REMARKS:

We will now place this file on a 90 day reporting diary and provide a status report to your office at that time. In the meantime, please feel free to contact the undersigned with any questions or comments regarding the above.

Very truly yours,


John Walker
Account Claims Rep
856-727-3055

enc.

# EXHIBIT 15

C.O.INS

June 3, 2004

New Jersey Turnpike Authority
PO Box 1121
New Brunswick, NJ 08903
  Attn: Harris Galary, Manager,
         Safety & Benefits

Re: Michael Faas
     Date of Loss: 9/25/92
     Our Claim No: W2592-47003

Dear Mr. Galary:

With regard to the above matter, enclosed please find two checks from TIG Insurance Company. The check for $39,581.53 is for reimbursement of indemnity/medical paid over the SIR, minus the amount previously paid; and the other for $2,583.10 for reimbursement of pro rata expenses, minus the amount previously paid. Please handle accordingly.

Very truly yours,

John Walker
Account Claims Rep
856-727-3055

enc.

00022

# TIG INSURANCE COMPANY
## TIG INSURANCE COMPANY

W2592-47003

MKI613

| | | |
|---|---|---|
| **Check Number** | **Date of Check** | **Reference Number** |
| 613336210 | 05/11/04 | 6110511220006 |

| | | |
|---|---|---|
| **Policy Number** | **Claim Number** | **Region - Agent** |
| 00141626 | 00B02052585 | 96-010 |

| | |
|---|---|
| **Name of Insured** | **Location** |
| NEW JERSEY TURN | 12Q |

| | |
|---|---|
| **Employee/Claimant Name** | **Claims Office** |
| FAAS, MICHAEL | P & C CORP CLAIMS |

| | | |
|---|---|---|
| **Date of Loss** | **Check Amount** | **Office Telephone Number** |
| 09/25/82 | $39,581.53 | |

**Payee Name**

NEW JERSEY TURNPIKE AUTHORITY, ATTN JOHN WALKER/RE MICHAEL FAAS

**Payee Address**

C/O PMA 100 CENTURY PKWY MT LAUREL NJ 080545007

**In Payment of**

LOSS REIMBURSEMENT EXCESS SIR

| **From Date** | **Through Date** |
|---|---|
| / / | / / |

— REMOVE DOCUMENT ALONG THIS PERFORATION —



⑆613336210⑆ ⑈031100209⑈ 38539845⑈

W2592-47003
mkub

# TIG INSURANCE COMPANY
## TIG INSURANCE COMPANY

| Check Number | Date of Check | Reference Number |
|---|---|---|
| 613336209 | 05/11/04 | 6110511220005 |

| Policy Number | Claim Number | Region - Agent |
|---|---|---|
| 00141626 | 00B02052585 | 96-010 |

**Name of Insured**
NEW JERSEY TURN

**Location**
12Q

**Employee/Claimant Name**
FAAS, MICHAEL

**Claims Office**
P & C CORP CLAIMS

**Date of Loss**
09/25/92

**Check Amount**
$2,583.10

**Office Telephone Number**

**Payee Name**
NEW JERSEY TURNPIKE AUTHORITY, ATTN JOHN WALKER/RE MICHAEL FAAS

**Payee Address**
C/O PMA 100 CENTURY PKWY MT LAUREL NJ 080545007

**In Payment of**
PRORATA EXPENSE REIMB EXCESS SIR

**From Date**
/ /

**Through Date**
/ /

— REMOVE DOCUMENT ALONG THIS PERFORATION —



⑈613336209⑈  ⑉031100209⑉  38539845⑈

EXHIBIT 16

C.O.O

3
6
8

September 1, 2004


Wexford Underwriting Managers, Inc.
40 Fulton Street
23rd Floor
New York, NY 10038-3714
  Attn: Joseph J. Griswold, Jr.
        Regional Claims Manager

Re: Insured/Client: New Jersey Turnpike Authority
    Injured Worker/Petitioner: Michael Faas
    Date of Loss: 9/25/92
    Our Claim No: W2592-47003
    Policy No: W-141626A

Dear Mr. Griswold:

Please accept this letter as a status report on the above captioned New Jersey Workers'
Compensation matter.

DESCRIPTION OF ACCIDENT:

This injured worker/petitioner was working as a toll collector on the above date of
accident, when there was a chemical spill in the toll lanes. A total of four employees were
taken to the hospital but Mr. Faas was the only employee who did not return to work
immediately. After reviewing the petitioner's medical records the claim was denied, as it
was found the petitioner had a pre-existing pulmonary condition, which was documented
on 10/20/89 by Dr. Sherbin, the Turnpike Authority's Medical Director during that time.

CLAIM SUMMARY:

As you are aware, the petitioner received an award of 100% total permanent disability or
450 weeks at $409 per week, for a total award of $184,000. Following the decision by the
judge, an appeal was filed.  During the appeal process, the New Jersey Turnpike
Authority Commissioners authorized payment in full of the permanent disability awarded
less the Section 40 credit as a result of the 3rd party case. The petitioner would have been
entitled to this payment regardless of the outcome of the appeal. The payment was for the
original 450 weeks and covered the period 4/1/93-11/16/01.

Page 2

The Appellate Division eventually upheld the decision of Judge Marinari and indicated that the medical testimony supported a finding of 100% total disability based upon the pulmonary condition of the petitioner. In applying case law, the Appellate Division found that from the testimony adduced at trial, there was simply not sufficient evidence that the pre-existing disability the petitioner did have affected his ability to work or his personal lifestyle.

Since the petitioner had been paid up to 11/16/01, there were to be no further payments made to him until the first 4 week period following 11/16/01. Those payments have now begun, and we are paying the petitioner $136.33 per week for 161 2/7 weeks or 11/16/01-12/19/04. The petitioner is currently receiving $545.32 per month. Starting on 12/20/04, we will begin paying the petitioner at the social security offset rate of $370.34 per week. We will continue to pay benefits at this offset rate until the petitioner reaches the age of 62 on 2/8/14. Thereafter, payments will be made to the petitioner at the full total rate of $409 per week for the rest of his life.

MEDICAL:

As you are aware, along with this award the Turnpike Authority is also responsible for future medical treatment required by the petitioner, for pulmonary related illnesses. The petitioner has basically been stable at this time and has only required routine ongoing medical treatment.

RESERVES:

|  | Incurred | Paid | Outstanding |
|---|---|---|---|
| Medical | $490,094 | $288,572.31 | $201,521.00 |
| Indemnity | $259,832 | $101,931.52 | $157,900.00 |
| Expenses | $35,000 | $33,482.18 | $1,517.00 |
| Totals | $784,926 | $423,986.01 | $360,938.00 |

|  |  |
|---|---|
|  | $390,503.83 – Indemnity & Medical paid |
| - | $250,000.00 – Self Insured Retention (SIR) |
| = | $140,503.83 |
| - | $130,312.67 – Total reimbursement to date |
| = | $10,191.16 – Reimbursement owed |

We have received a total of $11,472.54 for Pro Rata Expenses.

Page 3

**REMARKS:**

We will now place this file on a 90 day reporting diary and provide a status report to your office at that time. In the meantime, please feel free to contact the undersigned with any questions or comments regarding the above.

Very truly yours,

John Walker
Account Claims Rep
856-727-3055

enc.

Cc: Harris Galary

EXHIBIT 17

C.O. INS        QFTRJAW

September 30, 2004


New Jersey Turnpike Authority
PO Box 1121
New Brunswick, NJ 08903
  Attn: Harris Galary, Manager,
        Safety & Benefits

Re: Michael Faas vs. New Jersey Turnpike Authority
    Date of Loss: 9/25/92
    Our Claim No: W2592-47003

Dear Mr. Galary:

With regard to the above matter, enclosed please find two reimbursement checks received
from TIG Insurance, for the amount paid out over the self-insured retention level of
$250,000. The check for indemnity/medical is in the amount of $10,191.16 and the check
for pro rata expenses is in the amount of $574.40. We have documented the file
accordingly and are now forwarding the checks to you for deposit. This brings the total
reimbursement to date to $140,503.83 for indemnity/medical, and $12,046.94 for
expenses.

Please feel free to contact the undersigned with any questions regarding the above.


Very truly yours,



John Walker
Account Claims Rep
856-727-3055

enc.

00045

# TIG INSURANCE COMPANY
## TIG INSURANCE COMPANY

| Check Number | Date of Check | Reference Number |
|---|---|---|
| 613430524 | 09/20/04 | 6110920220028 |

| Policy Number | Claim Number | Region - Agent |
|---|---|---|
| 00141626 | 00B02052585 | 96-010 |

| Name of Insured | Location |
|---|---|
| NEW JERSEY TURN | 12Q |

| Employee/Claimant Name | Claims Office |
|---|---|
| FAAS, MICHAEL | P & C CORP CLAIMS |

| Date of Loss | Check Amount | Office Telephone Number |
|---|---|---|
| 09/25/92 | $10,191.16 | |

**Payee Name**

NEW JERSEY TURNPIKE AUTHORITY, ATTN JOHN WALKER/RE MICHAEL FAAS

**Payee Address**

C/O PMA 100 CENTURY PKWY MT LAUREL NJ 080545007

**In Payment of**

LOSS REIMBURSEMENT EXCESS SIR

| From Date | Through Date |
|---|---|
| / / | / / |

--- REMOVE DOCUMENT ALONG THIS PERFORATION ---

| Claim Number | Location | | Check Number |
|---|---|---|---|
| 00B02052585 | 12Q | | 613430524 |

Social Security No./Tax I.D. No.

RE: FAAS, MICHAEL

**TIG INSURANCE**℠

TIG INSURANCE COMPANY

Date  09/20/04

Amount

*****$10,191.16

Void after six months

**PAY**  Ten thousand one hundred ninety one and 16/100 Dollars

To the
order of

NEW JERSEY TURNPIKE AUTHORITY
ATTN JOHN WALKER/RE MICHAEL FAAS
C/O PMA
100 CENTURY PKWY
MT LAUREL NJ 080545007

CITIBANK DELAWARE -- A SUBSIDIARY OF CITICORP
ONE PENN'S WAY
NEW CASTLE, DE 19720

⑈613430524⑈ ⑆031100209⑆ 38537845⑈

# TIG INSURANCE COMPANY

TIG INSURANCE COMPANY

| Check Number | Date of Check | Reference Number |
|---|---|---|
| 613430523 | 09/20/04 | 6110920220027 |

| Policy Number | Claim Number | Region - Agent |
|---|---|---|
| 00141826 | 00B02052585 | 96-010 |

| Name of Insured | Location |
|---|---|
| NEW JERSEY TURN | 12Q |

| Employee/Claimant Name | Claims Office |
|---|---|
| FAAS, MICHAEL | P & C CORP CLAIMS |

| Date of Loss | Check Amount | Office Telephone Number |
|---|---|---|
| 09/25/92 | $574.40 | |

### Payee Name

NEW JERSEY TURNPIKE AUTHORITY, ATTN JOHN WALKER/RE MICHAEL FAAS

### Payee Address

C/O PMA 100 CENTURY PKWY MT LAUREL NJ 080545007

### In Payment of

PRORATA EXPENSE REIMB. EXCESS SIR

| From Date | Through Date |
|---|---|
| / / | / / |

— REMOVE DOCUMENT ALONG THIS PERFORATION —

| Claim Number | Location | | | Check Number |
|---|---|---|---|---|
| 00B02052585 | 12Q | | 02-20 / 311 | 613430523 |
| Social Security No./Tax I.D. No. | | | | Date  09/20/04 |
| | | TIG INSURANCE | | Amount |
| RE: FAAS, MICHAEL | | TIG INSURANCE COMPANY | | *******$574.40 |
| | | | | Void after six months |

**PAY**   Five hundred seventy four and 40/100 Dollars

To the
order of    NEW JERSEY TURNPIKE AUTHORITY
ATTN JOHN WALKER/RE MICHAEL FAAS
C/O PMA
100 CENTURY PKWY
MT LAUREL  NJ  080545007

CITIBANK DELAWARE - A SUBSIDIARY OF CITICORP
ONE PENN'S WAY
NEW CASTLE, DE 19720

⑈613430523⑈ ⑆031100209⑆ 38537845⑈

EXHIBIT 18

C.O.G

February 14, 2005

Wexford Underwriting Managers, Inc.
40 Fulton Street
23rd Floor
New York, NY 10038-3714
  Attn: Joseph J. Griswold, Jr.
        Regional Claims Manager

Re: Insured/Client: New Jersey Turnpike Authority
    Injured Worker/Petitioner: Michael Faas
    Date of Loss: 9/25/92
    Our Claim No: W2592-47003
    Policy No: W-141626A

Dear Mr. Griswold:

Please accept this letter as a status report on the above captioned New Jersey Workers' Compensation matter.

DESCRIPTION OF ACCIDENT:

This injured worker/petitioner was working as a toll collector on the above date of accident, when there was a chemical spill in the toll lanes. A total of four employees were taken to the hospital but Mr. Faas was the only employee who did not return to work immediately. After reviewing the petitioner's medical records the claim was denied, as it was found the petitioner had a pre-existing pulmonary condition, which was documented on 10/20/89 by Dr. Sherbin, the Turnpike Authority's Medical Director during that time.

CLAIM SUMMARY:

As you are aware, the petitioner received an award of 100% total permanent disability or 450 weeks at $409 per week, for a total award of $184,000. Following the decision by the judge, an appeal was filed. During the appeal process, the New Jersey Turnpike Authority Commissioners authorized payment in full of the permanent disability awarded less the Section 40 credit as a result of the 3rd party case. The petitioner would have been entitled to this payment regardless of the outcome of the appeal. The payment was for the original 450 weeks and covered the period 4/1/93-11/16/01.

Page 2

The Appellate Division eventually upheld the decision of Judge Marinari and indicated that the medical testimony supported a finding of 100% total disability based upon the pulmonary condition of the petitioner. In applying case law, the Appellate Division found that from the testimony adduced at trial, there was simply not sufficient evidence that the pre-existing disability the petitioner did have affected his ability to work or his personal lifestyle.

Since the petitioner had been paid up to 11/16/01, there were to be no further payments made to him until the first 4 week period following 11/16/01. Those payments have now begun, and we are paying the petitioner $136.33 per week for 161 2/7 weeks or 11/16/01-12/19/04. The petitioner had been receiving $545.32 per month. Starting on 12/20/04, we began paying the petitioner at the social security offset rate of $370.34 per week. We will continue to pay benefits at this offset rate until the petitioner reaches the age of 62 on 2/8/14. Thereafter, payments will be made to the petitioner at the full total rate of $409 per week for the rest of his life.

MEDICAL:

As you are aware, along with this award the Turnpike Authority is also responsible for future medical treatment required by the petitioner, for pulmonary related illnesses. The petitioner has basically been stable at this time and has only required routine ongoing medical treatment.

RESERVES:

|  | Incurred | Paid | Outstanding |
|---|---|---|---|
| Medical | $490,094 | $298,572.11 | $191,521.00 |
| Indemnity | $259,832 | $107,270.28 | $152,561.00 |
| Expenses | $35,000 | $33,482.18 | $1,517.00 |
| Totals | $784,926 | $439,324.57 | $345,601.00 |

```
    $405,842.39 – Indemnity & Medical paid
 -  $250,000.00 – Self Insured Retention (SIR)
 =  $155,842.39
 -  $140,503.83 – Total reimbursement to date
 =   $15,338.56 – Reimbursement owed
```

We have received a total of $12,046.94 for Pro Rata Expenses.

Page 3

REMARKS:

As you are aware, PMA will no longer be the workers compensation administrator for the
New Jersey Turnpike Authority, as of March 1, 2005. As a result, please accept this
correspondence as our final report on the above matter.


Very truly yours,


John Walker
Account Claims Rep
856-727-3055

enc.

Cc: Harris Galary

EXHIBIT 19

New Jersey Claims Service Office
P.O. Box 1457
Harrisburg, PA 17105-1457
609.883.0044 Phone
800.234.1348 Phone
866.894.1348 Fax

www.inservco.net

April 19, 2007



**INSERVCO**
INSURANCE SERVICES, INC.

Wexford Insurance
40 Fulton Street
23rd Floor
New York, NY 10038
Attn: Mr. Joseph J. Griswold

Re:  Insured/Client: New Jersey Turnpike Authority
       Injured Worker/Petitioner: Michael Faas
       D/A: 9/19/1992
       Our Claim No.: 308PM05928
       SIR: $250,000.00

Dear Mr. Griswold:

Please accept this as a status report on the above captioned New Jersey Workers'
Compensation matter.

DESCRIPTION OF ACCIDENT:

The injured worker, Michael Faas, suffered an inhalation injury caused by chemical
fumes from a tanker. The tanker had a chemical spill. Initially he suffered dizziness,
shortness of breath, eye problems, and sore throat.

RESERVES:

|  | Incurred | Outstanding | Paid | Recover |
|---|---|---|---|---|
| Medical | $495,094.00 | $219,283.79 | $299,853.43 | $24,043.22 |
| Indemnity | $269,532.00 | $119,302.28 | $150,229.72 | |
| Expenses | $35,500.00 | $753.66 | $34,746.34 | |
| Rehab | $4,478.00 | $3,400.00 | $1,078.00 | |
| Totals | $804,604.00 | $342,739.73 | $485,907.49 | |

CLAIM STATUS:

The claimant continues to be seen by Dr. Lucas for his pulmonary symptoms and Dr.
Busono a neurologist for his neuropathy symptoms which are stable. He continues to
receive breathing medication through MSC. Dr. Lucas currently wrote a script for
claimant to have a new pulse oimeter. He continues to be paid total perm disability in the
amount of $370.34 per week. Starting in 2014 the rate is to increase to $409.00 a week.

*1980 • Twenty-Five Years of Service • 2005*
*Inservco Insurance Services, Inc.*

OUTSTANDING ISSUE:

Dr. Lucas is relating a renal cyst to our claim; he states that his renal insufficiency results from his hospitalization which was prolonged from December 1999 to April of 2000. At this point, our nurse case manager Nancy Kulscar, RN does not see how Dr. Lucas can relate a renal cyst to our claim. Nancy Kulscar is going to schedule an Independent Medical Evaluation with a renal specialist to see if this is related to our claim.

EXCESS REIMBURSEMENT DUE:

The amount paid to date on this claim has surpassed the Self-Insured Retention Level of $250,00.00 so the New Jersey Turnpike Authority is now due for reimbursement. The figures are as followed:

485,907.49- Total Paid to Date
-250,000.00- Self Retention (SIR)
-24,043.22- RECOVERIES
=211,864.27- **TOTAL DUE TO INSURED**


Very truly yours,

Shanell Booker
Sr. Claim Representative


Cc:  Harris Galary
      Janine Seitz

EXHIBIT 20

April 24, 2007

Mr. Bob Gripp
TIG Insurance Company
5205 N. O'Connor Blvd.
P. O. Box 152867
Irving, Texas  75015-2867

| | |
|---|---|
| INSURED: | NEW JERSEY TURNPIKE AUTHORITY |
| CLAIMANT: | FAAS, MICHAEL |
| DATE OF LOSS: | 9/25/92 |
| WEXFORD CLAIM NO.: | WC-141626-04 |
| TIG CLAIM NO.: | B02052585 |

Dear Bob:

I received an update from Shanell Booker of Inservco on the above captioned matter, stating that the claimant continues to be seen by Dr. Lucas for his pulmonary symptoms and a neurologist for his neurological symptoms, which are stable.  The claimant continues to receive breathing medication and he now has a script for the claimant to have a new pulse meter.

He continues to be paid PTD in the amount of $370.34 per week and the rate will increase to $409 a week in 2014. Dr. Lucas is also relating a renal cyst to this claim, but the Nurse Case Manager does not agree.  She is going to schedule an I.M.E. with a renal specialist.

The following are the updated reserve figures as reported by the TPA as of 4/19/07:

| | PAID | OUTSTANDING | INCURRED |
|---|---|---|---|
| Medical | $300,931.43 | $198,640.57 | $499,572.00 |
| Indemnity | $150,229.72 | $119,302.28 | $269,532.00 |
| Expense | $34,746.34 | $753.66 | $35,500.00 |
| Total | $485,907.49 | $318,696.51 | $804,604.00 |

Shanell now includes the payment history and requests reimbursement.  Please issue a check in accordance with the attached Reimbursement Calculation and make them payable to New Jersey Turnpike Authority, then mail same in care of:

Rob Walter
Inservco Insurance Services
3150 Brunswick Pike, Suite 200
Lawrenceville, NJ  08648

Very truly yours,

Joseph J. Griswold, Jr.

EXHIBIT 21

New Jersey Claims Service Office
P.O. Box 1457
Harrisburg, PA 17105-1457
800.883.5944 Phone
800.334.1948 Phone
866.384.1948 Fax

www.inservco.net

 **INSERVCO**
INSURANCE SERVICES, INC.

## NEW JERSEY TURNPIKE AUTHORITY
### RECOVERY LETTER

Date: May 16, 2007

Claim # 308PM05928

Claimant: Michael Faas

Date of Accident: 9/25/1992

**Turnpike Division**                    Parkway Division

Lien Recovery:

      Indemnity Amount: $

      Medical Amount:    $

        TOTAL:

**EXCESS Recovery:  $39,249.53**

Carrier:  TIG Insurance Company

Indemnity Amount:    $

Medical Amount:      $39,249.53

Expense Amount:      $

      Sub Total: $39,249.53

**TOTAL EXCESS RECOVERY ON THIS CLAIM IS $63,292.75**

Adjuster:  Shanell C. Booker

05/09/2007 09:45 AM A9FBE_49525

00001

# TIG INSURANCE COMPANY
## TIG INSURANCE COMPANY

| | | |
|---|---|---|
| **Check Number** | **Date of Check** | **Reference Number** |
| 613810889 | 04/24/07 | 6110424220001 |
| **Policy Number** | **Claim Number** | **Region - Agent** |
| 00141626 | 00B02052565 | 96-010 |

**Name of Insured**
NEW JERSEY TURN

**Location**
12Q

**Employee/Claimant Name**
FAAS, MICHAEL

**Claims Office**
P & C CORP CLAIMS

**Date of Loss**
09/25/92

**Check Amount**
$39,249.53

**Office Telephone Number**
888-778-7262

**Payee Name**
NEW JERSEY TURNPIKE AUTHORITY, ATT: ROB WALTER

**Payee Address**
INSERVCO INS SRVCS 3150 BRUNSWICK PIKE #200 LAWRENCEVILLE NJ 08648

**In Payment of**
XS LOSS & EXPENSE. IND THRU 5/6/07

**From Date**
/ /

**Through Date**
/ /

R2XCES
SNB
4/27/07

— REMOVE DOCUMENT ALONG THIS PERFORATION —

THIS DOCUMENT HAS A COLORED-BACKGROUND PRINTED ON WHITE PAPER.

| | | |
|---|---|---|
| **Claim Number** | **Location** | **Check Number** |
| 00B02052565 | 12Q | 613810889 |
| Social Security No./Tax I.D. No. | | **Date** 04/24/07 |
| | | **Amount** |
| | | *****$39,249.53 |
| | | Void after six months |

**TIG INSURANCE** SM
TIG INSURANCE COMPANY

RE: FAAS, MICHAEL

**PAY** Thirty nine thousand two hundred forty nine and 53/100 Dollars

To the order of
NEW JERSEY TURNPIKE AUTHORITY
ATT: ROB WALTER
INSERVCO INS SRVCS
3150 BRUNSWICK PIKE #200
LAWRENCEVILLE NJ 08648

CITIBANK DELAWARE – A SUBSIDIARY OF CITICORP
ONE PENN'S WAY
NEW CASTLE, DE 19720

⑆613810889⑆ ⑈031100209⑈ 38539845⑈

308PM05928
DoA - 9-25-92

EXHIBIT 22

New Jersey Claims Service Office
P.O. Box 1457
Harrisburg, PA 17105-1457
609.883.0044 Phone
800.334.1348 Phone
866.334.1348 Fax

www.inservco.net

September 13, 2007



**INSERVCO**
INSURANCE SERVICES, INC.

Wexford Insurance
40 Fulton Street
23rd Floor
New York, NY 10038
Attn: Mr. Joseph J. Griswold

Re:  Insured/Client: New Jersey Turnpike Authority
     Injured Worker/Petitioner: Michael Faas
     D/A: 9/19/1992
     Our Claim No.: 308PM05928
     **SIR: $250,000.00**

Dear Mr. Griswold:

Please accept this as a status report on the above captioned New Jersey Workers'
Compensation matter.

**DESCRIPTION OF ACCIDENT:**

The injured worker, Michael Faas, suffered an inhalation injury caused by chemical
fumes from a tanker.  The tanker had a chemical spill.  Initially he suffered dizziness,
shortness of breath, eye problems, and sore throat.

**RESERVES:**

|          | Incurred     | Outstanding  | Paid         | Recover      |
|----------|--------------|--------------|--------------|--------------|
| Medical  | $495,094.00  | $218,587.79  | $339,798.96  | **$63,292.75** |
| Indemnity| $269,532.00  | $111,895.48  | $157,636.52  |              |
| Expenses | $60,638.57   | $11,136.14   | $49,502.43   |              |
| Rehab    | $4,478.00    | $2,681.00    | $1,797.00    |              |
| Totals   | $829,742.57  | $344,300.41  | $548,734.91  |              |

**CLAIM STATUS:**

The claimant continues to be seen by Dr. Lucas for his pulmonary symptoms and Dr.
Busono a neurologist for his neuropathy symptoms which are stable.  He continues to
receive prescription medication through MSC which is related to his claim. Mr. Faas was
admitted to St. Peter's Hospital for pain in the rib area and low oxygen level on 6/5/07-
6/14/07.  It was noted that he fractured his ribs due to coughing which also caused him
some back pain; MD recommended that employee have pulmonary physical therapy due
to his breathing. He continues to be paid total perm disability in the amount of $370.34
per week.  Starting in 2014 the rate is to increase to $409.00 a week.

**OUTSTANDING /UNRELATED ISSUES:**

As noted in the last report there was question of a renal cyst being related to our claim. With regards to the Independent Medical Evaluation the nurse case manager had there Medical Director Dr. Cukiermans review Dr. Lucas medical report regarding our relationship to the renal cyst and he states that there is no documentation or evidence of causality of incidental finding of renal cyst on CT scan of the chest and the nephrology claim is NOT related to our claim. Over the months, the petitioner gradually started losing weight and Dr. Lucas became concerned and ordered that the employee have a CT scan, this was placed through his secondary insurance. Results of the CT scan showed that petitioner had cancer on the right kidney. He had surgery on 9/4/07 to remove this kidney, surgery went well but his breathing failed and he is currently in the Intensive Care Unit.

**EXCESS REIMBURSEMENT DUE:**

The amount paid to date on this claim has surpassed the Self-Insured Retention Level of $250,000.00 so the New Jersey Turnpike Authority is now due for reimbursement. The figures are as followed:

548,734.91- Total Paid to Date
-250,000.00- Self Retention (SIR)
-63,292.75- RECOVERIES

Very truly yours,

Shanell Booker
Sr. Claim Representative

Cc: Harris Galary
    Janine Seitz

EXHIBIT 23

New Jersey Claims Service Office
P.O. Box 1457
Harrisburg, PA 17105-1457
800.833.0044 Phone
800.834.1348 Phone
866.834.1348 Fax

www.inservco.net



**INSERVCO**
INSURANCE SERVICES, INC.

## NEW JERSEY TURNPIKE AUTHORITY
### RECOVERY LETTER

Date: October 18, 2007

Claimant: Michael Faas

Date of Accident: 9/25/1992

<u>**Turnpike Division**</u>                 Parkway Division

Lien Recovery

     Indemnity Amount: $

     Medical Amount:    $

          TOTAL:    $

EXCESS Recovery

Carrier: TIG INSURANCE COMPANY

Indemnity Amount:    $ 57,291.99

Medical Amount:      $

Expense Amount:      $

       Sub Total: $ 57,291.99

TOTAL         RECOVERY ON THIS FILE IS $ 120,584.74

Adjuster: Shanell C. Booker

00002

# TIG INSURANCE COMPANY
## TIG INSURANCE COMPANY

| Check Number | Date of Check | Reference Number |
|---|---|---|
| 613815002 | 09/24/07 | 6110924220002 |

| Policy Number | Claim Number | Region - Agent |
|---|---|---|
| 00141826 | 00B02052585 | 96-010 |

| Name of Insured | Location |
|---|---|
| NEW JERSEY TURN | 12Q |

| Employee/Claimant Name | Claims Office |
|---|---|
| FAAS, MICHAEL | P & C CORP CLAIMS |

| Date of Loss | Check Amount | Office Telephone Number |
|---|---|---|
| 09/25/92 | $57,291.99 | 888-776-7262 |

**Payee Name**
NEW JERSEY TURNPIKE AUTHORITY, ATT:SHANELL BOOKER

**Payee Address**
INSERVCO INS SRVCS 3150 BRUNSWICK PIKE #200 LAWRENCEVILLE NJ 08648

**In Payment of**
XS LOSS & EXP. IND THRU 9/25

| From Date | Through Date |
|---|---|
| / / | / / |

—→ REMOVE DOCUMENT ALONG THIS PERFORATION ←—

THIS DOCUMENT HAS A COLORED BACKGROUND - PRINTED ON WHITE PAPER

| Claim Number | Location |
|---|---|
| 00B02052585 | 12Q |

Social Security No./Tax I.D. No.

# TIG INSURANCE℠
## TIG INSURANCE COMPANY

82-60
811

Check Number
613815002

Date : 09/24/07

Amount
*****$57,291.99
Void after six months

RE: FAAS, MICHAEL

PAY   Fifty seven thousand two hundred ninety one and 99/100 Dollars

To the
order of                                    AUTHORITY

CITIBANK DELAWARE – A SUBSIDIARY OF CITICORP
ONE PENN'S WAY
NEW CASTLE, DE 19720

⑈613815002⑈ ⑆031100209⑆ 38535845⑈

EXHIBIT 24

New Jersey Claims Service Office
Post Office Box 1457
Harrisburg, PA 17105-1457
909.883.0044 Phone
800.334.1843 Phone
866.334.1349 Fax

www.inservco.net

January 26, 2008



INSERVCO
INSURANCE SERVICES, INC.

Wexford Insurance
40 Fulton Street
23rd Floor
New York, NY 10038
Attn: Mr. Joseph J. Griswold

Re: Insured/Client: New Jersey Turnpike Authority
    Injured Worker/Petitioner: Michael Faas
    D/A: 9/19/1992
    Our Claim No.: 308PM05928
    SIR: $250,000.00

Dear Mr. Griswold:

Please accept this as a status report on the above captioned New Jersey Workers'
Compensation matter.

**DESCRIPTION OF ACCIDENT:**

The injured worker, Michael Faas, suffered an inhalation injury caused by chemical
fumes from a tanker. The tanker had a chemical spill. Initially he suffered dizziness,
shortness of breath, eye problems, and sore throat.

**RESERVES:**

|  | Incurred | Outstanding | Paid | Recover |
|---|---|---|---|---|
| Medical | $495,094.00 | $166,199.04 | $392,187.71 | $120,584.74 |
| Indemnity | $269,532.00 | $144,004.35 | $182,819.64 |  |
| Expenses | $60,638.57 | $10,552.70 | $50,085.87 |  |
| Rehab | $9,833.24 | $4,700.00 | $5,133.24 |  |
| Totals | $835,097.81 | $325,456.09 | $630,226.46 |  |

**CLAIM STATUS:**

The claimant continues to be seen by Dr. Lucas for his pulmonary symptoms and Dr.
Busono a neurologist for his neuropathy symptoms which are stable. Prescriptions are
now being filled through KeyScripts due to the continuous problems with prior
prescription provider MSC. Mr. Faas has had several admissions to the hospital on
numerous occasions. Most of the admissions are being review by nurse case manager
Nancy Kulscar, RN to see if the admission had anything to do with our claim. The
claimant's most recent admission to St. Peter's Hospital located in New Brunswick, NJ
was on *11/18/08 - 12/23/08* and his admitting diagnosis was respiratory failure.

At this time we are not in receipt of any medical records or bills. The telephonic nurse case manager spoke with the admission department to obtain the admitting diagnosis. During his stay in the hospital he was placed on ventilator and now needs to be treated for diabetes as they are relating this to the prednisone he is taking for our pulmonary claim. He is not functioning independently and requires a visiting nurse. The number of hours has not yet been determined. Nancy Kulscar will set this up through VNA of NJ. He also continues to have pulmonary physical therapy due to his breathing.

He continues to be paid total perm disability in the amount of $370.34 per week. Starting in 2014 the rate is to increase to $409.00 a week.

## OUTSTANDING /UNRELATED ISSUES:

As noted in the last report there was question of a renal cyst being related to our claim. With regards to the Independent Medical Evaluation the nurse case manager had there Medical Director Dr. Cukiermans review Dr. Lucas medical report regarding our relationship to the renal cyst and he states that there is no documentation or evidence of causality of incidental finding of renal cyst on CT scan of the chest and the nephrology claim is NOT related to our claim. Over the months, the petitioner gradually started losing weight and Dr. Lucas became concerned and ordered that the employee have a CT scan, this was placed through his secondary insurance. Results of the CT scan showed that petitioner had cancer on the right kidney. He had surgery on 9/4/07 to remove this kidney, surgery went well but his breathing failed and was placed in the Intensive Care Unit where a tracheotomy was inserted.

## EXCESS REIMBURSEMENT DUE:

The amount paid to date on this claim has surpassed the Self-Insured Retention Level of $250,000.00 so the New Jersey Turnpike Authority is now due for reimbursement. The figures are as followed:

630,226.46- Total Paid to Date
-250,000.00- Self Retention (SIR)
-120,584.74- RECOVERIES
=$259,641.72 TOTAL DUE TO INSURED

Very truly yours,

Shanell Booker
Sr. Claim Representative

Cc: Harris Galary
      Jim Mustillo

EXHIBIT 25

## Booker, Shanell

| | |
|---|---|
| **From:** | Booker, Shanell |
| **Sent:** | Thursday, April 29, 2010 4:00 PM |
| **To:** | 'joseph.morello@remltd.com' |
| **Cc:** | Galary, Harris; 'JMUSTILLO@turnpike.state.nj.us' |
| **Subject:** | Michael Faas vs. NJTPA 308PM05928 |
| **Attachments:** | SKMBT_42110042916010.pdf; MICHEAL FAAS 308PM05928 PAYMENT LEDGER |

Hi Joe,
  Attached please find supplemental excess report for Mr. Faas.  You should have all other documents, prior emails and correspondence as we discussed.  Also attached is a payment ledger of all payments made on file to date.

  Once you had a chance to review, please advise if there is anything further you need in order for reimbursement to be made.

  Thank you,
Shanell Booker

**From:** Penn_National_Insurance_MOPIER@pnat.com [mailto:Penn_National_Insurance_MOPIER@pnat.com]
**Sent:** Thursday, April 29, 2010 5:01 PM
**To:** Booker, Shanell
**Subject:** Scanned Document From NJ - Inservco

4/29/2010

New Jersey Claims Service Office
Post Office Box 1457
Harrisburg, PA 17105-1457
609.683.0044 Phone
800.334.1348 Phone
866.334.1348 Fax

www.inservco.net



April 29, 2010

**INSERVCO**
INSURANCE SERVICES, INC.

*Supplemental Report*

Wexford Insurance
40 Fulton Street
23rd Floor
New York, NY 10038
Attn:  Mr. Joseph J. Griswold

Re:  Insured/Client:  New Jersey Turnpike Authority
      Injured Worker/Petitioner:  Michael Faas
      D/A:  9/19/1992
      Our Claim No.:  308PM05928
      **SIR:  $250,000.00**

Dear Mr. Griswold:

Please accept this as a status report on the above captioned New Jersey Workers'
Compensation matter.

**DESCRIPTION OF ACCIDENT:**

The injured worker, Michael Faas, suffered an inhalation injury caused by chemical
fumes from a tanker.  The tanker had a chemical spill.  Initially he suffered dizziness,
shortness of breath, eye problems, and sore throat.



Page 2
Faas, Michael

## CLAIM STATUS:

The claimant continues to treatment with Dr. Lucas on regular basis. He is in an out of the Hospital for related and unrelated medical issues. All Hospitalization admissions are reviewed and followed by the assigned nurse case manager, Nancy Kulscar, RN. Mr. Fass pulmonary condition is controlled with a number of prescribed medications. He is also receiving a substantial amount of medial equipment from a company called All Care. All authorized prescription are placed through KeyScripts. This case needs aggressive case management. Due to Michael's severe pulmonary condition, the treating MD, Dr. Lucas ordered 24hrs. home nursing. This service is being provided by VNA of NJ. He continues to be paid total perm disability in the amount of $370.34 per week. Starting in 2014 the rate is to increase to $409.00 a week.

## OUTSTANDING /UNRELATED ISSUES:

As noted in the last report there was question of a renal cyst being related to our claim. With regards to the Independent Medical Evaluation the nurse case manager had there Medical Director Dr. Cukiermans review Dr. Lucas medical report regarding our relationship to the renal cyst and he states that there is no documentation or evidence of causality of incidental finding of renal cyst on CT scan of the chest and the nephrology claim is NOT related to our claim. Over the months, the petitioner gradually started losing weight and Dr. Lucas became concerned and ordered that the employee have a CT scan, this was placed through his secondary insurance. Results of the CT scan showed that petitioner had cancer on the right kidney. He had surgery on 9/4/07 to remove this kidney, surgery went well but his breathing failed and was placed in the Intensive Care Unit where a tracheotomy was inserted. Mr. Faas is also having issues with his low back which at this time the nurse states is not related to our pulmonary claim.

## EXCESS REIMBURSEMENT DUE:

The amount paid to date on this claim has surpassed the Self-Insured Retention Level of **$250,000.00** so the New Jersey Turnpike Authority is now due for reimbursement. The figures are as followed:

$962, 546,31- Total Paid to Date
-250,000.00- Self Retention (SIR)
=$712,546.31
-273,945.64- RECOVERIES
=$438,600.67 **TOTAL DUE TO INSURED**

Very truly yours,

Shanell Booker
Sr. Claim Representative

EXHIBIT 26

To: INSVNJ <INSVNJ@pnat.com>
From: "Booker, Shanell" <SBooker@pnat.com>
Date: Tue, 21 Dec 2010 11:16:19 -0500
Subject: FW: Michael Faas v NJT - 308PM05928- Reimbursement Request EXCESS

3- ATTACHMENTS FROM EXCESS CARRIER

**From:** joseph.morello@remltd.com [mailto:joseph.morello@remltd.com]
**Sent:** Wednesday, July 21, 2010 8:53 AM
**To:** Bob_Gripp@TRG.com
**Cc:** Booker, Shanell
**Subject:** Michael Faas v NJT - 6951005147 - Reimbursement Request

Bob, please reimburse $393,996.25 as follows:

| | |
|---|---|
| Indemnity: | $67,000 |
| Medical: | $300,333.53 |
| IndExpense: | $4,852.61 |
| MedExpense: | $21,810.11 |

Please make payable to: New Jersey Turnpike Authority
and send to:



You are very familiar w/this high-exposure claim that involves live-in care. The file has not been reimbursed since Sept, 2007.
Just the other day, we set out an action plan (see below) with a main focus of determining the need for live-in care and the medical
conditions for which we are responsible.

Thanks, Joe

Joseph Morello
Home Office Quality Assurance
Technical Manager
Risk Enterprise Management
2540 U.S. Hwy 130
Suite 109
Cranbury, NJ  08512
(860) 265-2052 - p
(609) 495-2098 - f

—— Forwarded by Joseph Morello/HQ/US/Remltd on 07/21/2010 08:38 AM ——

| Joseph Morello/HQ/US/Remltd | To | SBooker@pnat.com |
|---|---|---|
| | cc | Bob_Gripp@TRG.com |
| 07/19/2010 11:29 AM | Subject | Re: FW: Michael Faas v NJT - 6951005147 Link |

EXHIBIT 27

New Jersey Claims Service Office
Post Office Box 1457
Harrisburg, PA 17105-1457
609.888.0044 Phone
800.334.1346 Phone
866.334.1346 Fax

www.inservco.net



July 27, 2011
*Supplemental Report*

**INSERVCO**
INSURANCE SERVICES, INC.

Wexford Insurance
40 Fulton Street
23rd Floor
New York, NY 10038
Attn: Mr. Joseph J. Griswold

Re:  Insured/Client:  New Jersey Turnpike Authority
     Injured Worker/Petitioner:  Michael Faas
     D/A: 9/19/1992
     Our Claim No.:  308PM05928
     **SIR: $250,000.00**

Dear Mr. Griswold:

Please accept this as a status report on the above captioned New Jersey Workers'
Compensation matter.

**DESCRIPTION OF ACCIDENT:**

The injured worker, Michael Faas, suffered an inhalation injury caused by chemical
fumes from a tanker.  The tanker had a chemical spill.  Initially he suffered dizziness,
shortness of breath, eye problems, and sore throat.





Page 2
Faas, Michael

**CLAIM STATUS:**

The claimant continues to treatment with Dr. Lucas on regular basis. He is in an out of the Hospital for related and unrelated medical issues. All Hospitalization admissions are reviewed and followed by the assigned nurse case manager, Linda Louis. Mr. Faas pulmonary condition is controlled with a number of prescribed medications. He is also receiving a substantial amount of medial equipment from a company called All Care. All authorized prescription is placed through KeyScripts. Due to Michael's severe pulmonary condition, the treating MD, Dr. Lucas ordered 24hrs. home nursing care. This service is now being provided by Bayada Nurses, Inc. He continues to be paid total perm disability in the amount of $370.34 per week. Starting in 2014 the rate is to increase to $409.00 a week. Through out the course we were approved to utilized ANS Rehab Services to help with medical issues that were no related to claim.

**OUTSTANDING /UNRELATED ISSUES:**

As you are aware we continue to monitor Mr. Faas unrelated issues that are unrelated to our claim.

**EXCESS REIMBURSEMENT DUE:**

The amount paid to date on this claim has surpassed the Self-Insured Retention Level of **$250,000.00** so the New Jersey Turnpike Authority is now due for reimbursement. The figures are as followed:

$1,904,845.66– Total Paid to Date
-250,000.00– Self Retention (SIR)
=$1,654,845.66
**-273,945.64– RECOVERIES**
=$1,380,900.02 **TOTAL DUE TO INSURED**


Very truly yours,

Shanell Booker
Sr. Claim Representative


Cc:  Harris Galary
     Jim Mustillo

EXHIBIT 28

To: INSVNJ <INSVNJ@pnat.com>
From: "Booker, Shanell" <SBooker@pnat.com>
Date: Wed, 4 Jan 2012 15:12:08 -0500
Subject: FW: Michael Faas v NJ Turnpike Authority - CG 33886------- REQ FOR REIMBURSEMENT
FROM EXCESS CARRIER

---

**From:** Booker, Shanell
**Sent:** Wednesday, January 04, 2012 3:12 PM
**To:** 'William_Mason@TRG.com'
**Subject:** RE: Michael Faas v NJ Turnpike Authority - CG 33886

Mr. Mason,
    Can you please advise what is it that I need to do further in order to seek some of the recovery back for the Turnpike. I have been providing information and phone conferences needed since 2010. I just recently completed another form that was provided by Excess Carrier.
Thank you,
Shanell

---

**From:** William_Mason@TRG.com [mailto:William_Mason@TRG.com]
**Sent:** Wednesday, December 28, 2011 10:42 AM
**To:** Booker, Shanell
**Cc:** riverstone@pmsionline.com
**Subject:** Michael Faas v NJ Turnpike Authority - CG 33886

Hi Shanell,

RiverStone is now contracted with PMSI to take advantage of their services related to pharmacy, DME, home health care, etc.
By copy of this e-mail, I am referring the Faas file to PMSI for their review and assessment of the Home Health Care situation.
I ask that you cooperate fully with PMSI in regards to this matter.

Please comply with the following:

## Reply to All and send e-mail which includes:

- **Your full contact information:** Adjuster name, phone number, office location
- **Medical information:** Key medical products and services occurring in the past 3 months. Scan and e-mail copies of all current **medical bills** for DME, related services and **Home Health Care** or fax them to 813.635.4229.

For PMSI: There are numerous concerns here, some of which are mentioned below. It is unclear to me if there has been any negotiation as to HHC rate. The level of service required is questioned. Really the entire HHC package needs to be reviewed and controlled. Thank you for taking on this assignment.

Bill Mason

EXHIBIT 29

CC: ngalary@authpike.state.nj.us   <ngalary@authpike.state.nj.us>,   joseph.moreno@remltd.com"
<joseph.morello@remltd.com>, INSVNJ <INSVNJ@pnat.com>
From: "Booker, Shanell" <SBooker@pnat.com>
Date: Tue, 31 Jan 2012 10:25:25 -0500
Subject: Michael Faas vs. NJTPA 308PM05928 EXCESS

Mr. Mason,
    Attached are a string of emails from , Linda Louis, NCM. She continues to update us on Mr. Faas medical
status. He is still in hospital and not doing well.  I also continue to wait for PMSI to reach out to me regarding the
transfer.  We are looking at a significant hospital bill which will need to be audited.  We continue to wait for
reimbursement.  If you are waiting on anything from me which may be holding up the reimbursement, please let
me know.

Thanking you in advance for your time and patience in the matter.

Shanell
Mr. Faas is on the hospital again, I'm waiting for a clinical update and diagnosis. Linda


Linda Louis,RN,CRRN,CCM
Field Case Manager
973-257-5200  X5556
FAX: 908-543-1029

This message, and any attachment, contains PRIVILEGED & CONFIDENTIAL information intended for the use of the addressee listed above. If you
are neither the intended recipient nor the employee or agent responsible for delivering this information to the intended recipient, you are hereby notified
that any disclosure, copying, distribution, or taking of any action in reliance on the content of this message is strictly prohibited. You are directed to
immediately and permanently delete/destroy this message and any attachment.

From: Booker, Shanell [mailto:SBooker@pnat.com]
Sent: Thu 1/5/2012 1:03 PM
To: Linda Louis
Cc: Kelly Royce
Subject: RE: Michael Faas v NJ Turnpike Authority - CG 33886

Linda,
  Inservco is not transferring anything.  This request is coming from the Excess Carrier.  There is nothing for you to
do at this point.  I believe that PMSI will be handling the  durable equip , pharm, home care and nurse case
management.  I am just waiting for someone to get in contact with me.  All things remain same until I hear back
from them.

Thanks
Shanell


From: Linda Louis [mailto:LLOUIS@FirstMCO.com]
Sent: Thursday, January 05, 2012 12:17 PM
To: Booker, Shanell
Cc: Kelly Royce
Subject: RE: Michael Faas v NJ Turnpike Authority - CG 33886

Shanell
Which services are you transferring to PMSI? Shouldn't FMCO be involved in this? Please advise . Linda

# EXHIBIT 30

**Booker, Shanell**

| | |
|---|---|
| **From:** | Booker, Shanell |
| **Sent:** | Tuesday, September 04, 2012 10:07 AM |
| **To:** | 'Mason, William' |
| **Subject:** | FW: 308PM05928 FAAS MICHAEL      308 |
| **Importance:** | High |
| **Attachments:** | IR110000.pdf |

IR110000.pdf (4
MB)

Hello Mr. Mason,
    Our client patiently waits for a response for reimbursement on this claim.  If you
are no longer handling this claim can you please put me in contact with someone who will
assist me.  The attached email is still unanswered.

Thank you,

Shanell

1

S&C

TIG INSURANCE COMPANY
250 COMMERCIAL STREET, SUITE 5000
MANCHESTER, NH

IN HAND ONLY

S&C

RIVERSTONE CLAIMS MANAGEMENT, LLC
250 COMMERCIAL STREET, SUITE 5000
MANCHESTER, NH

IN HAND ONLY